[No. C036505. Third Dist. Dec. 21, 2001.]

AMERICAN CONTRACT SERVICES, Plaintiff and Appellant, v.
ALLIED MOLD & DIE, INC., Defendant and Respondent;
BILL LOCKYER, as Attorney General, etc., Intervener and Respondent.

COUNSEL

Dauer & Thompson, Paul F. Dauer and Jennifer L. Dauer for Plaintiff and Appellant.

Law Offices of Richard G. Anderson and Richard G. Anderson for Defendant and Respondent.

Bill Lockyer, Attorney General, Christopher Ames, Assistant Attorney General, Larry Raskin and Denise J. Fischer, Deputy Attorneys General, for Intervener and Respondent.

## OPINION

**HULL, J.**—The False Claims Act (hereafter sometimes referred to as the Act) (Gov. Code, § 12650 et seq.) imposes treble damage liability on one who, among other things, "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval." (Gov. Code, § 12651, subd. (a)(1).) Where the Attorney General initiates litigation under the Act, or intervenes in an action initiated by a private party, the Attorney General may move to dismiss the case on a showing of "good cause." (Gov. Code, § 12652, subd. (e)(2)(A).)

In this matter, we conclude good cause for dismissal exists where the Attorney General establishes that the False Claims Act cause of action is without merit. We further conclude that the submission of a claim for payment on a contract allegedly entered into in violation of state contracting laws, where the state was fully aware of and instigated the alleged violations, does not contravene the Act.

### FACTS AND PROCEDURAL HISTORY

In August 1998, the Procurement Division of the Department of General Services (DGS/PD) issued an invitation for bids to obtain 500,000 infant training cups for use in the state's Women and Infant Children (WIC) program administered by the Department of Health Services. Included with the invitation was a detailed set of specifications for the cup, including a size of six ounces, a resealable twist cap, three holes in the top of the spout and neon colors for the caps. Attachment 1 set forth requirements for disabled veteran business enterprise (DVBE) participation. Among other things, it

specified a 3 percent participation goal and indicated "[b]idders must meet DVBE Participation Program requirements to be viewed as a responsive bidder and considered for contract award."

DGS/PD received three bids, one from plaintiff American Contract Services (ACS), one from defendant Allied Mold & Die, Inc. (Allied), and one from a business named Comade. The low bidder was Comade, at $325,000. However, DGS/PD concluded Comade's bid was not responsive to the invitation, because the cup design was not in accordance with the specifications provided. Allied was the next lowest bidder, at $350,000. That bid indicated it was in compliance with the technical requirements, except that caps for the training cups did not come in neon colors. Allied's bid also did not comply with attachment 1, the DVBE requirement. ACS submitted a bid of $465,000, which indicated ACS planned to obtain the cups from either Allied, or a company named El Nino Products. ACS's bid complied with attachment 1.

Rather than accept any of the bids, DGS/PD cancelled its solicitation and contracted directly with Allied as the "sole source" of a conforming product. Allied thereafter delivered the 500,000 training cups and submitted an invoice for payment of $350,000, plus tax. DGS/PD paid the invoice amount.

ACS initiated this action against Allied for violation of the False Claims Act. The Attorney General intervened on behalf of the state. Allied demurred to the complaint, and the Attorney General submitted a statement of nonopposition. On January 13, 2000, the trial court sustained the demurrers with leave to amend until January 24.

On January 24, 2000, ACS submitted a first amended complaint, which included claims against the state for violation of bidding requirements and waste of public funds. Allied again demurred, and the Attorney General submitted a statement of nonopposition on the False Claims Act cause of action. Following supplemental briefing, the trial court entered an order striking ACS's amended complaint. The court concluded ACS did not have authority to file the amended complaint, because the litigation was under the control of the Attorney General. According to the court: "Once the demurrer was sustained with leave to amend, the AG should have either filed an amended complaint or filed a motion to dismiss. The AG cannot merely file statements of non-opposition and allow the complaint to be dismissed without filing the required motion." The court ordered the Attorney General to file either an amended complaint, or a motion to dismiss.

On June 9, 2000, the Attorney General filed a motion to dismiss. Over ACS's opposition, the trial court granted the motion and entered judgment of dismissal.

### DISCUSSION

### I

### *The False Claims Act*

The False Claims Act was enacted in 1987 and is patterned largely on similar federal legislation (31 U.S.C.A. § 3729 et seq.). (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 494 [99 Cal.Rptr.2d 721].) The Act is designed "to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities" by authorizing private parties (referred to as qui tams or relators) to bring suit on behalf of the government. (*Id.* at pp. 494-495.) The ultimate purpose of the Act is to protect the public fisc. (*LeVine v. Weis* (1998) 68 Cal.App.4th 758, 765 [80 Cal.Rptr.2d 439].)

Under the Act, treble damages may be imposed on one who, among other things, "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval." (Gov. Code, § 12651, subd. (a)(1); all subsequent undesignated section references are to the Government Code.) A "claim" within the meaning of the Act includes "any request or demand for money, property, or services made to any employee, officer, or agent of the state or any political subdivision . . . ." (§ 12650, subd, (b)(1).) " 'Knowing' " and " 'knowingly' " are defined to mean "that a person, with respect to information, does any of the following: [¶] (A) Has actual knowledge of the information. [¶] (B) Acts in deliberate ignorance of the truth or falsity of the information. [¶] (C) Acts in reckless disregard of the truth or falsity of the information. [¶] Proof of specific intent to defraud is not required." (§ 12650, subd. (b)(2).)

The Attorney General is required to investigate any violations of the Act that involve claims for state funds and may bring a civil action against an offending party. (§§ 12651, 12652, subd. (a)(1).) Where local funds are involved, actions may be brought on behalf of any political subdivision of the state by the local prosecuting authority. (§ 12652, subd. (b)(1).) Private parties may also initiate False Claims Act proceedings, in which case a copy of the complaint must be served on the Attorney General. (§ 12652, subd. (c)(3).) The Attorney General may, within 60 days, "intervene and proceed

with the action." (§ 12652, subd. (c)(4).) If the Attorney General does so, "the action shall be conducted by the Attorney General . . ." (§ 12652, subd. (c)(6)(A)), who has primary responsibility for prosecuting it. However, the qui tam plaintiff "shall have the right to continue as a full party to the action." (§ 12652, subd. (e)(1).)

Where the Attorney General has intervened in a False Claims Act proceeding, he "may seek to dismiss the action for *good cause* notwithstanding the objections of the qui tam plaintiff if the qui tam plaintiff has been notified by the state . . . of the filing of the motion and the court has provided the qui tam plaintiff with an opportunity to oppose the motion and present evidence at a hearing." (§ 12652, subd. (e)(2)(A), italics added.)

## II

### *Good Cause for Dismissal*

In this matter, the Attorney General elected to intervene and thereby assume control of the litigation. Following Allied's successful demurrer to the complaint, ACS sought to file an amended complaint, which the trial court rejected. The court concluded the decision to file an amended complaint was in the hands of the Attorney General and directed the Attorney General to file either an amended complaint, or a motion to dismiss. The Attorney General chose the latter.

ACS argues the Attorney General failed to establish good cause for dismissal. According to ACS, good cause requires consideration of the best interests of the parties and the public purposes behind the act, whereas the Attorney General relied on a purported lack of merit in the False Claims Act cause of action. ACS argues the primary purpose underlying the Act—protection of the public fisc—is not furthered by dismissal of the action.

The question of what is meant by "good cause" under the Act is a matter of statutory interpretation, which we consider de novo. (See *Rail-Transport Employees Assn. v. Union Pacific Motor Freight* (1996) 46 Cal.App.4th 469, 473 [54 Cal.Rptr.2d 713].) ACS's argument is based on section 12652, subdivision (c)(1), which reads: "A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff. *Once filed, the action may be dismissed only with the written consent of the court, taking into*

*account the best interests of the parties involved and the public purposes behind this act.*" (Italics added.)

Allied argues the foregoing provision applies only where the action is being prosecuted by a private party. Allied points to the general structure of section 12652, which addresses suits brought by the Attorney General in subdivision (a), suits by political subdivisions in subdivision (b), and suits brought by private parties in subdivision (c).

We find Allied's argument persuasive. Although subdivision (c)(5) of section 12652 provides for intervention by the Attorney General in any action brought by a private party, subdivision (c)(1), which contains the language on which ACS relies, concerns actions initiated by private parties and does not mention the Attorney General.

Section 12652, subdivision (e), addresses actions prosecuted by the state or a political subdivision, whether initiated by the government, or by a private party. Section 12652, subdivision (e)(2)(A) requires "good cause" for dismissal. "Good cause" is not defined in the Act. However, there is no reason to believe the Legislature intended that the consideration of "good cause" be limited to what is in the best interests of the parties, or what furthers the purposes behind the Act. Different considerations come into play when a decision to dismiss is made by a public prosecutor, who is charged with doing justice to all involved, rather than a private party.

The Attorney General and Allied argue the standard enunciated by the federal court in *U.S. v. Baird-Neece Packing Corp.* (9th Cir. 1998) 151 F.3d 1139 *(Baird-Neece)* establishes the proper standard for assessing good cause. In *Baird-Neece,* the court adopted the following two step analysis: " '(1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose.' [Citation.] If the government satisfies the two-step test, the burden switches to the relator 'to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal.' " *(Id.* at p. 1145.)

Although the False Claims Act is patterned largely on its federal counterpart *(Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 494), and therefore federal decisions are persuasive on the meaning of the Act (see *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320 [93 Cal.Rptr.2d 36, 993 P.2d 366]), there is a marked difference in the standard for dismissal in the two acts. Whereas state law requires "good cause" for dismissal, the federal act provides: "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the

person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." (31 U.S.C. § 3730 (c)(2)(A).) In *Baird-Neece*, the court adopted a dismissal standard where none was stated in the statute in order to satisfy substantive due process concerns. (*Baird-Neece, supra,* 151 F.3d at pp. 1145-1146.)

 There is nothing in the legislative history of the Act that would shed light on what the Legislature intended "good cause" to mean. The term has been defined in a number of published decisions in other contexts. For example, in *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412], the state high court discussed an employer's right to terminate an employee subject to an implied contract requiring good cause. The court defined good cause in this context as "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." (*Id.* at pp. 107-108.)

In *Block v. Superior Court* (1998) 62 Cal.App.4th 363 [72 Cal.Rptr.2d 610], the Court of Appeal considered Penal Code section 4004, which permits release of a county jail inmate for "good cause," in the context of a well-known actor's request to be released to complete a film. The court indicated: "Implicit in the 'good cause' requirement of section 4004 is that such orders will only be issued in exceptional circumstances, and then only rarely. Underlying a release order requiring police supervision is that such an order necessarily infringes upon a law enforcement agency in the lawful discharge of its responsibility to maintain the custody of prisoners committed to the agency's jail. . . . Also underlying release orders such as the one issued here, i.e., that a deputy was to provide transportation to and from a particular location, and to provide security for the inmate while at that location, is that the agency is at risk of a lawsuit should an injury (to the inmate, officer or third parties) occur during the period of time the inmate is away from the jail." (*Block,* at p. 370.) The court listed several factors to be considered, including whether the inmate is likely to pose a danger to the public, whether the inmate has followed jail rules and regulations, and the nature of the activity for which release is sought. (*Ibid.*)

The Indian Child Welfare Act of 1978 (the ICWA) (25 U.S.C.A. § 1901 et seq.) provides that, for placement of a child, preference shall be given to the child's family or other Indian families "in the absence of good cause to the contrary . . . ." (25 U.S.C.A. § 1915(a).) In *In re Alicia S.* (1998) 65 Cal.App.4th 79 [76 Cal.Rptr.2d 121], the court mentioned a number of

out-of-state decisions that have described the factors to be considered in assessing good cause under the ICWA: "[I]n *Matter of Adoption of F.H.* (Alaska 1993) 851 P.2d 1361, 1363-1364, after acknowledging that a good cause determination is within the superior court's discretion, the appellate court affirmed a trial court's deviation from the Act's placement preferences based upon the mother's preference for the prospective adopting parents, the bond between the minor and the prospective adopting mother, and the uncertainty of the minor's future if not adopted. In *Matter of Baby Boy Doe* (1995) 127 Idaho 452 [902 P.2d 477, 487], the court looked to the mother's wishes, the certainty of psychological and emotional trauma if the child was removed from the adoptive parents, the likelihood of emotional damage if the child had contact with the father while living with extended family, and the extraordinary physical or emotional needs as established by testimony of a qualified expert witness. And in *Adoption of M.* (1992) 66 Wn.App. 475 [832 P.2d 518, 522], the court enumerated the following factors: the best interests of the child, the wishes of the biological parents, the suitability of the persons preferred for placement, the child's ties to the tribe and the child's ability to make any cultural adjustments necessitated by the particular placement." (*In re Alicia S., supra,* 65 Cal.App.4th at pp. 88-89.)

As the foregoing cases demonstrate, the concept of good cause is "relative"; its existence depends on the particular circumstances of each case. (*Walker v. Blue Cross of California* (1992) 4 Cal.App.4th 985, 994 [6 Cal.Rptr.2d 184].) Essentially, any matter that has a bearing on the issues at hand may be considered. Here, for example, both the best interests of the parties and the purposes underlying the Act are appropriate considerations. At the same time, any matter that bears on whether the lawsuit should properly be dismissed should also be considered. This would include, at a minimum, the relative merits of the action. Obviously, where a qui tam action, in which the Attorney General has initially intervened, appears later to have little or no merit, such that continued prosecution is likely to result in a waste of limited government resources, good cause for dismissal is established.

III

*The Qui Tam Claim*

ACS contends the complaint adequately states a claim under the False Claims Act. ACS argues the contract entered into between DGS/PD and Allied was in excess of DGS/PD's authority and therefore void. ACS further argues Allied is deemed to have known the extent of DGS/PD's contracting

authority and, therefore, knew there was no legal basis for payment on the contract when Allied's claim was submitted. Thus, according to ACS, the claim for payment was a false claim under the Act.

ACS's arguments are based, in part, on Public Contract Code section 10301, which at all times relevant to this dispute, read: "Except in cases when the agency and the department agree that an article of a specified brand or trade name is the only article which will properly meet the needs of the agency, . . . all written contracts for the sale or hiring of materials, supplies, or equipment in an amount of ten thousand dollars ($10,000) or more, and all other purchases or hiring of materials, supplies, or equipment in an amount of ten thousand dollars ($10,000) or more, shall be made or entered into with the lowest responsible bidder meeting specifications." (Stats. 1986, ch. 626, § 1, pp. 2131-2132.) ACS argues the exception does not apply here, because DGS/PD did not conclude that only a particular "brand or trade name" would meet its needs but rather concluded the product of only one vendor would suffice. ACS argues the state may not structure its bid so as to limit the bidding to only one bidder. (See Pub. Contract Code, § 10318.)

ACS also relies on Executive Order No. W-103-94, which was signed by the Governor on August 17, 1994. It states that no " 'sole-source' " contract is authorized, "except in the case of State Emergency, or where public health and safety so requires," and it mandates that "all 'sole-source' contracts entered into by the State of California shall, without exception, require the express written approval of the Cabinet-level Agency Secretary with jurisdiction over the contract, as well as the Department of General Services."

The Attorney General counters that Public Contract Code section 10301 is applicable here, because, under the circumstances presented, "an article of a specified brand or trade name," i.e., the cups manufactured by Allied, "is the only article which will properly meet the needs of the agency." (Pub. Contract Code, § 10301, Stats. 1986, ch. 626, § 1, p. 2131.) The Attorney General presented evidence that ACS proposed to purchase the cups it offered to sell the state from either Allied, or a company that turned out not to be a supplier of cups or not to be authorized to do business in this state. The Attorney General further argues the executive order is inapplicable, because the procurement of cups for the WIC program involves public health and safety concerns. At any rate, according to the Attorney General, the remedy for violation of the executive order is discipline, not voiding the contract.

We need not resolve the foregoing arguments. ACS's contentions are based on an underlying premise that submission of a claim for payment on a

void contract is a false claim. As we shall explain, regardless of the validity of this premise in general, it has no application under the facts presented here.

Both the Attorney General and Allied contend there cannot be a knowing presentation of a false claim where the government is fully aware of the facts surrounding the claim and approves it. In *U.S. ex rel. Durcholz v. FKW, Inc.* (7th Cir. 1999) 189 F.3d 542 (*Durcholz*), an unsuccessful bidder on a dredging subcontract filed a federal false claims act (FCA) suit against the general contractor (FKW) and a contracting specialist. Officers at a naval warfare center wanted to remove sediment from two ponds and solicited bids. They decided to have the ponds dredged, rather than doing more expensive excavation. In order to speed up the bidding process, they used a "Unit Price Book" (UPB). However, the UPB had a line item for excavation but none for dredging, and the governing regulations permitted the contractor to complete the job as desired, i.e., by dredging or excavation. Nevertheless, all potential bidders were informed the work was expected to be done by dredging with an excavation line item used for pricing. The winning bidder completed the dredging work, and the general contractor submitted an invoice for payment using the UPB line item for excavation. (*Id.* at pp. 543-544.)

On the question of what constitutes a "knowing" submission of a false claim, the circuit court of appeals provided the following explanation: " '[i]nnocent mistakes or negligence are not actionable'; '[w]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false.' [Citation.] The government's prior knowledge of an allegedly false claim can vitiate a FCA action. [Citations.] If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." (*Durcholz, supra,* 189 F.3d. at pp. 544-545.)

In finding no false claim under the facts presented, the *Durcholz* court indicated: "[T]he government not only knew that FKW's proposal and invoices contained excavation line-items, it directed FKW to use those pricing numbers. In essence, then, Durcholz is alleging that the government was defrauded by the very activities that its agents ordered. We decline to hold FKW liable for defrauding the government by following the government's explicit directions." (*Durcholz, supra,* 189 F.3d at p. 545.)

Consistent with the reasoning of the court in *Durcholz*, the state Court of Appeal, in *People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68

Cal.App.4th 654 [80 Cal.Rptr.2d 419], found no False Claims Act violation where the contractor had done only what was directed by government officials. There, it was alleged a Medi-Cal provider's practice of submitting unbundled invoices for certain tests amounted to false claims. The trial court found this practice had been adopted on instructions from a Medi-Cal representative, and the Court of Appeal concluded this finding was supported by substantial evidence. (*Id.* at pp. 672-673.) Thus, according to the appellate court, the plaintiff failed to establish that the defendant knowingly made a false claim under the Act. (*Id.* at p. 673.)

ACS argues *Durcholz* is inapposite, because the contract there was valid, and the only question was one of contract interpretation; here, the contract is allegedly void. This is a distinction without a difference. The critical factor present in both *Durcholz* and *Duz-Mor*, as well as the instant matter, is that the claim for payment was somehow defective, but the defect was known to and initiated by the government.

ACS cites *U.S. ex rel. Kreindler v. United Technologies* (2d Cir. 1993) 985 F.2d 1148, 1156 and *U.S. ex rel. Hagood v. Sonoma County Water Agency* (9th Cir. 1991) 929 F.2d 1416, 1421 (*Hagood*) for the proposition that government knowledge does not necessarily preclude a False Claims Act violation. However, *Hagood* involved a situation where the individual government employees, who had knowledge of the situation, were allegedly involved in some way in the fraudulent scheme. (*Hagood*, at pp. 1417-1418.) The *Kreindler* court cited *Hagood* for the proposition that government knowledge does not necessarily bar an FCA claim. (*Kreindler*, at p. 1156.)

In the present matter, there is no allegation of fraud or collusion between Allied and the government officials involved in the procurement. The government alone decided to abort the bidding process and invoke sole sourcing to purchase the cups from Allied. Even if this was an improper contracting practice, Allied did nothing more than acquiesce in the government's contracting proposal. Allied supplied the cups, as requested, and submitted an invoice for payment. The government paid the invoice with full knowledge of the circumstances.

In *Durcholz*, the court discussed the impact of the government's violation of contracting regulations: "It appears that [government] officials, wanting to expedite the project and still choose the method of performance, may have stretched the contracting regulations to or beyond their limits. 'But the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.'" (*Durcholz, supra,* 189 F.2d at p. 545, fn. 2.) We

agree. ACS's complaint is not that Allied defrauded the government by submitting an invoice for payment on the contract entered into with DGS/PD but that DGS/PD did not follow proper contracting practices and ACS was harmed thereby. The False Claims Act is not a proper vehicle for vindicating that harm.

Because there was no merit in ACS's False Claims Act cause of action, the trial court properly granted the Attorney General's motion to dismiss.

### DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 2002.