[No. B148045. Second Dist., Div. One. May 31, 2001.]

CITY OF POMONA et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JAMES JONES COMPANY et al., Real Parties in Interest.

## Counsel

Phillips & Cohen, Eric R. Havian, Lisa A. Foster, Mary A. Inman; Irell & Manella, Gregory R. Smith, S. Thomas Pollack, Elizabeth A. Camacho and Stephen Hasegawa for Petitioners.

Bill Lockyer, Attorney General, Pamela Smith-Steward, Chief Assistant Attorney General, Christopher M. Ames, Assistant Attorney General, and Anthony M. Bova, Deputy Attorney General, for the State of California as Amicus Curiae on behalf of Petitioners.

John M. Kaheny, City Attorney (Chula Vista), for the City of Chula Vista as Amicus Curiae on behalf of Petitioners.

Louise H. Renne, City Attorney (San Francisco), and Owen J. Clements for City and County of San Francisco as Amicus Curiae on behalf Petitioners.

J. Richard Doyle, City Attorney (San Jose), and Malgorzata Laskowska for City of San Jose as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Horvitz & Levy, Mitchell C. Tilner, Karen M. Bray; Beck, De Corso, Daly & Kreindler, Bryan D. Daly, Anthony A. De Corso, Suzanne E. Tracy; Stanzler, Funderburk & Castellon, Ruben A. Castellon and Willaim W. Funderburk, Jr., for Real Parties in Interest James Jones Company, Mueller Co. and Tyco International (US), Inc.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, David S. MacCuish, Kurt Osenbaugh and Todd Benoff for Real Party in Interest Watts Industries, Inc.

**OPINION**

**SPENCER, P. J.—**

INTRODUCTION

The City of Pomona (City) and qui tam[1] plaintiff Nora Armenta (Armenta) petition for a writ of mandate commanding the trial court to reinstate the City's first cause of action, which alleges the violation of the California False Claims Act[2] (Gov. Code, § 12650 et seq.)[3] by real parties in interest James Jones Company, Mueller Co., Tyco International (US), Inc. and Watts Industries, Inc. We grant the writ petition.

STATEMENT OF FACTS[4]

James Jones Company and its parent companies, Mueller Co., Tyco International (US), Inc., and Watts Industries, Inc. (hereinafter collectively referred to as Jones), manufacture and supply pipes and other water distribution parts that are sold directly to municipalities for carrying drinking water or to contractors for eventual use in municipal water systems. Jones represented in its catalogues and sales literature that all of its pipes, valves, fittings, stops and ball valves comply with American Water Works Association (AWWA) standards. AWWA Standard C-800-89 requires all material that comes into contact with potable water to contain 85 percent copper and 5 percent each of tin, lead and zinc (85 metal). The permissible variance within the industry for each element is 1 percent. AWWA imposes this standard "[b]ecause of the potential for corrosion of high-zinc brasses."

A catalogue for Jones service saddles contains pipe compatibility data, model numbers, size ranges and a recitation of the materials used and descriptions of 17 different service saddles. At the bottom of the page, the catalogue states, "Note: All bronze castings are 85-5-5-5." Following pages provide sizing information.

---

[1] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.' " (*Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765, 768, fn. 1 [120 S.Ct. 1858, 1860, 146 L.Ed.2d 836].)

[2] The City also alleges causes of action for fraud, negligent misrepresentation, and unjust enrichment. These causes of action, which carry no civil penalties and do not provide for treble damages, remain viable.

[3] Unless otherwise specified, all section references hereinafter are to the Government Code.

[4] Inasmuch as all material facts pleaded in the complaint and those which arise by reasonable implication, but not conclusions of fact or law, are deemed admitted by the demurring party (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 638 [29 Cal.Rptr.2d 152, 871 P.2d 204]; *Interinsurance Exchange v. Narula* (1995) 33 Cal.App.4th 1140, 1143 [39 Cal.Rptr.2d 752]), we derive our facts from the second amended complaint.

A catalogue for Jones corporation stops contains eight pages that provide the model numbers, descriptions and size ranges of 11 different corporation stops. An introductory page provides "general information." Number 8 among the items of general information is that "[a]ll Jones corporation stops are manufactured in accordance with the AWWA Standard C-800-89. 85-5-5-5 alloy."

A catalogue for Jones curb stops follows the same format. A "general information" page precedes model numbers, descriptions and size ranges of nine different curb stops. Under the subheading "Trouble Free Operation," the catalogue's general information page states, "All James Jones water-works products conform to AWWA specifications."

In its catalogues and sales literature, Jones emphasized the corrosion-resistant properties of 85 metal, stating that it is "highly corrosion resistant." Jones's products are made of 85 metal "for long, long, life," "to insure long life in the harshest soils," or "for corrosion protection."

Jones offered its water distribution parts for sale in catalogues that were "circulated . . . to potential customers and to distributors through whom Jones sold its products with the expectation that Jones's potential customers would refer to those catalog[ues] in ordering water distribution parts." "In order to enable the City to purchase Jones parts through Jones's authorized distributors, Jones provided catalog[ues] describing Jones's products to the City, and to Jones's distributors. . . . The statements were intended and had the natural tendency to induce Jones's potential customers (including the City) to purchase Jones parts."

One metal with a higher zinc content than 85 metal is popularly known as 81 metal, or "Copper Alloy UNS No. 84400." It is comprised of 81 percent copper, 9 percent zinc, 3 percent tin and 7 percent lead. "Not only is the zinc content nearly double that of 85 metal, but the lead content, of significant concern to water customers," is 40 percent greater than in 85 metal. Another metal of less durability is known as 360 metal, or "free cutting brass." This metal is comprised of 60 percent copper and 40 percent zinc. It corrodes approximately five times faster than 85 metal.

Due to the higher zinc and lead content of 81 metal and the higher zinc content of 360 metal, the City "require[s] vendors to provide valves and other components that are fabricated with bronze conforming to or exceeding the metal content standards described in AWWA [S]tandard C-800. Thus, at a minimum, any part that comes into contact with water must be made of 85 metal. Those parts include valves, which control the flow of

water from the main water line to a residence; balls, the component of a valve that either blocks or permits the flow of water through the valve; saddles; connections; and couplings."

Beginning in 1991, Jones's president instructed Armenta, who was Jones's purchasing manager, to purchase raw metal with less copper and more lead or zinc. Jones manufactured and sold pipes and valves using 81 metal rather than 85 metal as it continued to represent in its catalogues and sales materials that the pipes and other parts either complied with AWWA standards or were made of 85 metal. Jones also manufactured or purchased from suppliers certain sizes of balls for valves made from 360 metal while continuing to represent that these parts were made of 85 metal. From 1991 through 1993, the City made six purchases of Jones ball valves from Jones's distributors.

Jones manufactured or purchased other plumbing parts from its suppliers knowing they were made of 81 metal while representing that these parts met AWWA requirements of 85 metal. Jones consciously determined as a cost-saving measure that it "no longer [would] use 85 metal for certain sizes of the ball component of its valves." A Jones internal memorandum recited that "many parts were being manufactured from 81 that should be 85." More-over, Jones rebuffed Armenta's concerns about the failure to use 85 metal.

In 1997, Jones discovered that an overseas supplier, Wu Feng Enterprise Co., Ltd., distributed a catalogue showing that Jones parts were made of 81 metal. Jones complained that a competitor was showing the Wu Feng catalogue to Jones customers, thereby "exposing us to scrutiny . . . . The next step . . . our customer might take is testing metallurgy which they would not have done if not shown your advertisement." The customer then would discover that the metal was not 85-5-5-5 as Jones had represented.

The City of Pomona purchased Jones products from Jones's distributors from 1991 through 1997. The City had a long history of buying waterworks products. It usually dealt with the same set of distributors when doing so. The City sent a request for quotation, which specified a Jones pipe or part by its part number, to a distributor. Throughout the bidding and purchasing process, the City used Jones catalogue numbers to identify the parts it sought. Based on their long history with the City, the distributors understood that the part was to conform to the description given in the Jones catalogue and to AWWA standards. That is, "[t]he City and the selling distributor shared an understanding that the description of those parts as set forth in Jones's catalog and sales literature formed one of the terms of agreement between the City and the distributor for the City's purchase of Jones parts."

In the past, the City returned parts that did not conform to the specifications set forth in the Jones catalogue.

Jones made false claims in the catalogues and sales materials it provided to its distributors in the knowledge that the distributors would provide the parts to the City. By providing these "patently false" catalogue representations to the City, Jones intended to and "very natural[ly]" did induce the City to contract with the distributors for purchase of Jones parts. Had the City known that the catalogue statements were false, it would not have made these contracts. Jones thereafter "knowingly caused distributors to deliver parts to the City that did not conform to the descriptions of those parts in Jones's" catalogues. Had the City known the parts did not conform to those descriptions, it would not have paid the distributors.

## CONTENTION

Petitioners contend the trial court abused its discretion in sustaining without leave to amend real parties in interest's demurrer to petitioners' causes of action alleging violations of the California False Claims Act, in that they have alleged adequately the specifications of the parts ordered. Moreover, petitioners assert, they have alleged adequately fraudulent inducement. For the reasons set forth below, we agree.

## DISCUSSION

A demurrer tests the sufficiency of a complaint by raising questions of law. (*Rader Co. v. Stone* (1986) 178 Cal.App.3d 10, 20 [223 Cal.Rptr. 806].) The complaint must be construed liberally by drawing reasonable inferences from the facts pleaded. (*Flynn v. Higham* (1983) 149 Cal.App.3d 677, 679 [197 Cal.Rptr. 145].) Where written documents are the foundation of an action and are attached to the complaint and incorporated therein by reference, they become a part of the complaint and may be considered on demurrer. (*Byrne v. Harvey* (1962) 211 Cal.App.2d 92, 103 [27 Cal.Rptr. 110]; see also *Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1626-1627 [272 Cal.Rptr. 623].) A demurrer must be sustained where the facts alleged do not entitle the plaintiffs to relief under any possible legal theory. (See *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817].) Where there is no possibility amendment would cure the complaint's defects, it is appropriate to sustain the demurrer without leave to amend. (*Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 118-119 [113 Cal.Rptr. 102, 520 P.2d 726].)

This court is not bound by the trial court's construction of the complaint, however, but must make its own independent interpretation. (*Rader Co. v.*

*Stone, supra,* 178 Cal.App.3d at p. 20.) We do not review the validity of the trial court's reasoning but only the propriety of the ruling itself. (*Lee v. Bank of America* (1990) 218 Cal.App.3d 914, 919 [267 Cal.Rptr. 387]; *Mayflower Ins. Co. v. Pellegrino* (1989) 212 Cal.App.3d 1326, 1332 [261 Cal.Rptr. 224].)

The California False Claims Act permits the recovery of civil penalties and treble damages from any person who "[k]nowingly presents or causes to be presented [to the state or any political subdivision] . . . a false claim for payment or approval." (§ 12651, subd. (a)(1).) The word "person" "includes any . . . corporation[ or] business . . . ." (§ 12650, subd. (b)(5).) A "claim" "includes any request or demand for money . . . made to any employee, officer, or agent of the state or of any political subdivision . . . ." (*Id.*, subd. (b)(1).) A plaintiff must allege that the person had actual knowledge of the falsity of the information, acted in deliberate ignorance of its truth or falsity, and/or acted in reckless disregard of its truth or falsity. (*Id.*, subd. (b)(2).)

A governmental plaintiff may recover three times damages, plus costs, plus a penalty of $10,000 for each false claim. (§ 12651, subd. (a).) If the governmental agency does not pursue the action, a private person (qui tam plaintiff or relator) may file a civil action on behalf of a governmental agency. (§ 12652, subds. (c)(1), (d).) A qui tam plaintiff may "receive an amount that the court decides is reasonable for collecting the civil penalty and damages on behalf of the government. The amount shall not be less than 25 percent and not more than 50 percent of the proceeds of the action or settlement and shall be paid out of these proceeds." (§ 12652, subd. (g)(3).) Otherwise, a qui tam plaintiff "receive[s] at least 15 percent but not more than 33 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which [she] contributed to the prosecution of the action." (§ 12652, subd. (g)(2).)

■ California's False Claims Act is "patterned on a similar federal statutory scheme (31 U.S.C. § 3729 et seq.)." (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 494 [99 Cal.Rptr.2d 721].) Its purpose is "to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities." (*Ibid.*)

As stated in *Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 725 [36 Cal.Rptr.2d 665], inasmuch as the False Claims Act "obviously [is] designed to prevent fraud on the public treasury, [it] plainly should be given the broadest possible construction consistent with that purpose." Stated otherwise, the act "must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and

remedies it provides." (*LeVine v. Weis* (1998) 68 Cal.App.4th 758, 764 [80 Cal.Rptr.2d 439].)

■ There is a dearth of California authority pertinent to the issues raised in this case. Given the lack of California authority and the very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the act.

Like the California False Claims act, the federal act is to be construed broadly rather than restrictively. (*United States v. Neifert-White Co.* (1968) 390 U.S. 228, 232 [88 S.Ct. 959, 961-962, 19 L.Ed.2d 1061]; *U.S. v. General Dynamics Corp.* (2d Cir. 1994) 19 F.3d 770, 773.) It is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." (*Neifert-White Co., supra,* at p. 232.) Its reach extends to "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud." (*U.S. ex rel. Marcus v. Hess* (1943) 317 U.S. 537, 544 [63 S.Ct. 379, 384, 87 L.Ed. 443].) The federal act "is the government's 'primary litigative tool for combatting fraud' against the . . . government." (*U.S. ex rel. Kelly v. Boeing Co.* (9th Cir. 1993) 9 F.3d 743, 745.)

The federal act permits private litigants to bring actions on behalf of the government against anyone who (1) knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government; or (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid. (31 U.S.C. §§ 3729(a), 3730(b).) The false statement or claim must be material. Materiality, a mixed question of law and fact, depends on " 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.' " (*U.S. ex rel. Berge v. Trustees of Univ. of Ala.* (4th Cir. 1997) 104 F.3d 1453, 1459, cert. den. 522 U.S. 916 [118 S.Ct. 301, 139 L.Ed.2d 232].)

Liability under the federal act attaches "when a contract was originally obtained based on false information or fraudulent pricing." (*Harrison v. Westinghouse Savannah River Co.* (4th Cir. 1999) 176 F.3d 776, 787-788; *U.S. ex rel. Hagood v. Sonoma County Water Agency* (9th Cir. 1991) 929 F.2d 1416, 1420.) In other words, the claim itself need not be false but only need be underpinned by fraud. As the court notes in *Harrison,* "the language of the False Claims Act statute does not anywhere state that False Claims Act liability depends upon a defendant's status as a recipient or beneficiary of the fraudulently induced contract." (*Harrison, supra,* 176 F.3d at p. 792.)

In *United States v. Veneziale* (3d Cir. 1959) 268 F.2d 504, a seller of real property induced the purchasers to represent falsely to the lender that the loan was for home improvement when it actually was for the purchase of the property. As the court noted, "the fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty [of the loan] upon which the government . . . had to pay [upon the borrower's default]. . . . Although the wrongdoer neither sought nor obtained any transfer of government funds . . . to himself, it has long since been settled that a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else." (*Id.*, at p. 505.)

█ As in any action sounding in fraud, the allegations of a federal False Claims Act complaint must be pleaded with particularity. The complaint must plead " 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.' " (*Harrison v. Westinghouse Savannah River Co., supra,* 176 F.3d at p. 784; cf. *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Allegations of the defendant's knowledge and intent to deceive may use conclusive language, however. (*Harrison, supra,* at p. 784.)

█ Petitioners have complied with these requirements, notwithstanding their reliance upon representations made in Jones catalogues. They have pleaded that the representations made in Jones catalogues from 1991 through 1997 were false, in that Jones made or acquired parts represented to be composed of 85 metal that were composed of 81 metal or 360 metal. The City has alleged that it received catalogues, ergo, the representations were made to it. Petitioners likewise have alleged that Jones knew these representations were false. They also have alleged that these false representations induced the City, which requires water distribution parts to be made from 85 metal, to purchase over the course of several years Jones parts represented to be made of 85 metal but in fact made of 81 metal or 360 metal. This, coupled with allegations of the inferior durability of lesser metal fittings and the higher lead content of 81 metal parts, establishes the materiality of the representations. Finally, petitioners have alleged reliance on the false representations and the consequent payment of money. It is immaterial that the representations were made in Jones catalogues rather than stated as specifications on the City's purchase orders and on Jones invoices. (See, e.g., *U.S. ex rel. Haskins v. Omega Institute, Inc.* (D.N.J. 1998) 11 F.Supp.2d 555, 566-567, decision clarified on reconsideration, 25 F.Supp.2d 510.)

The nature of catalogue sales is a subject well known to virtually everyone through personal experience. The very purpose of a catalogue is to generate

sales. The catalogue purveyor describes items and makes representations concerning them solely with the goal of enticing potential customers into placing orders. A catalogue has no other reason for being. This is true whether a manufacturer or a retailer produces the catalogue. It is true whether the catalogue is disseminated directly to potential customers or provided to distributors as a means of reaching the greatest number of potential customers with the greatest degree of efficiency. In short, in producing and disseminating a catalogue, a manufacturer or retailer intends by the representations made therein to induce purchases therefrom.

Moreover, as a matter of common practice, everyone—manufacturer, distributor, retailer and customer—understands that by specifying the catalogue, part or model number and a general description (bookcase, khaki pants, ball valve), the customer incorporates into his or her order all specifications represented in the catalogue to apply to the item. This is the case whether those specifications all follow the catalogue, part or model number or include a general specification noted at the bottom of the page, such as "all bookcases constructed of 100 percent hardwood" or "all bronze Jones ball valves are made of 85-5-5-5 metal alloy." Stated otherwise, by application of ordinary rules of statutory construction, receiving extrinsic evidence to resolve ambiguities (*U.S. ex rel. Lindenthal v. General Dynamics Corp.* (9th Cir. 1995) 61 F.3d 1402, 1411)—extrinsic evidence that every party understands and upon which every party relies, the purchase orders become clear.

For example, when the City ordered 30 James Jones J-1500 corporation stops in April 1995, Jones understood that this part was an "inlet male corporation stop thread outlet for flared copper." Jones also understood that the general information page preceding the various corporation stop descriptions represented J-1500, like all corporation stops, to be "manufactured in accordance with the AWWA Standard C-800-89. 85-5-5-5 alloy." The City and the Jones distributor from whom the City made its purchases shared the same understandings. *Jones* may not have relied upon the catalogue descriptions of its parts but it necessarily intended distributors and customers to rely upon them and to trust that when they received something labeled "J-1500 corporation stop," it conformed to the representations made in the catalogue.

When Jones supplied to the distributor corporation stops made of 81 metal and labeled J-1500, however, Jones caused the distributor to submit to the City a false claim for payment. The claim for payment was false for two reasons. First, the City's contract was based on false information provided by Jones, but for which the City would not have made the contract. (See, e.g., *U.S. ex rel. Schwedt v. Planning Research Corp.* (D.C. Cir. 1995) 59

F.3d 196, 199; *United States v. Veneziale, supra*, 268 F.2d at p. 506.) Second, according to the Jones catalogue, a J-1500 corporation stop is made of 85 metal. The distributor's bill for J-1500 corporation stops was false, in that the City received corporation stops made of 81 metal. Necessarily, then, these were not J-1500 corporation stops.

Real parties in interest argue that they cannot be liable in any event, for Jones had no knowledge that the City would be the end user of products it supplied to distributors. This signifies nothing. Jones certainly intended to attract every potential customer such as the City that it could attract. It bent its efforts to that end by supplying distributors with catalogues, sales literature and new product announcements. That is enough to make Jones liable for the fruits of its endeavors. (Cf. *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 [23 Cal.Rptr.2d 101, 858 P.2d 568].) It would not serve the purposes of the California False Claims Act to adopt any other rule. Leaving manufacturers free to cause the submission of false claims to governmental entities simply because they had no certain knowledge that a particular entity would become a consumer of its products would not serve to prevent fraud upon the government. (*Southern Cal. Rapid Transit Dist. v. Superior Court, supra*, 30 Cal.App.4th at p. 724.)

The petition for writ of mandate is granted. Let a peremptory writ of mandate issue forthwith commanding the superior court to set aside its order of January 19, 2001, dismissing the first cause of action of the City's complaint, in which the City alleges violation of the California False Claims Act. The court is directed to enter a new and different order overruling defendants' demurrer. Petitioners are to recover costs.

Ortega, J., and Mallano, J., concurred.

On June 29, 2001, the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied August 15, 2001, George, C. J., and Werdegar, J., did not participate therein.