[No. C050296. Third Dist. Aug. 31, 2006.]

STATE OF CALIFORNIA ex rel. ALAN GRAYSON, Plaintiff and Appellant, v.
PACIFIC BELL TELEPHONE CO. et al., Defendants and Respondents.

**COUNSEL**

Brian Taugher; Bronster Crabtree & Hoshibata and Margery S. Bronster for Plaintiff and Appellant.

Pillsbury Winthrop, Christopher R. Ball; Sidley Austin, Mark E. Haddad, Steven A. Ellis, Robert A. Holland, Nitin Reddy; Keker & Van Nest, Robert A. Van Nest, Steven A. Hirsch, R. James Slaughter; Reed Smith, Michele Floyd and Raymond Cardozo for Defendants and Respondents Pacific Bell Telephone Co., AT&T Corporation, AT&T Wireless Services, Inc., and Sprint Communications Company and its affiliates Sprint Co., Ltd. Partnership and Sprint Int'l. Communications Corp.

Sheppard, Mullin, Richter & Hampton and Steven B. Sacks for Defendants and Respondents Nextel Communications, Inc., Nextel of California, Inc., Nextel Operations, Inc., and Nextel Retail Stores, Inc.

**OPINION**

**RAYE, J.**—Qui tam relator Alan Grayson seeks a bounty under the False Claims Act (FCA; Gov. Code, § 12650 et seq.) for compelling telecommunication companies to escheat to the state balances on prepaid telephone cards by sidestepping the procedures provided by the Unclaimed Property Law (UPL; Code Civ. Proc., § 1500 et seq.) and circumventing the State Controller, the notice provisions, and the absence of any determination of liability under the law. Although in his third amended complaint he does not plead he had any specific *inside* knowledge of undisclosed fraud, he does allege that defendants' duty to escheat was *public* knowledge. We must decide whether the qui tam complaint has helped the government ferret out

fraud it otherwise might not have uncovered or whether the allegations or transactions are substantially similar to information already in the public domain.

In sustaining defendant telecommunication companies'[1] demurrer to the third amended complaint without leave to amend, the trial court skipped the threshold issue of subject matter jurisdiction and decided that balances on prepaid telephone cards did not constitute property under the UPL. We affirm the dismissal of the complaint but for a different reason: the complaint does not overcome the jurisdictional bar established by Government Code section 12652, part of the FCA. Nor does plaintiff have standing to pursue his unfair competition claims set forth in his second cause of action.

## I

## LEGAL CONTEXT: THE UPL HOOK FOR A REVERSE FALSE CLAIM

*The Unclaimed Property Law*

The UPL compels holders of certain classes of abandoned property subject to escheat to report and deliver the property to the State Controller (Controller), who is responsible for enforcing the UPL and may investigate suspected violations. (Code. Civ. Proc., §§ 1530, 1532, 1571.)[2] The Controller may examine the records of any person reasonably believed to have failed to report property subject to escheat. (§ 1571.) The Controller can opt to bring an action to enforce the right to an examination or to obtain a judicial determination that property is subject to escheat. (§ 1572, subd. (a)(1), (2).)

The UPL imposes penalties for the willful failure to report and deliver abandoned property subject to escheat but only *after* the Controller has given notice by certified mail of the violation and the violator has failed to respond. (§ 1576, subd. (c).) Section 1576 provides: "(a) Any person who willfully fails to render any report or perform other duties, including use of the report format described in Section 1530, required under this chapter shall be punished by a fine of one hundred dollars ($100) for each day such report is withheld or such duty is not performed, but not more than ten thousand dollars ($10,000). [¶] (b) Any person who willfully refuses to pay or deliver

---

[1] Defendants include Pacific Bell Telephone Co. and SBC Corp.; AT&T Corp., together with its division SmarTalk, affiliate AT&T Communications of California, Inc., and former divisions AT&T Wireless Services, Inc., and its affiliate AT&T Wireless Services of California; and Sprint Corp. and its affiliates Sprint Communications Co. Limited Partnership and Sprint International Communications Corp.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

escheated property to the controller as required under this chapter shall be punished by a fine of not less than five thousand dollars ($5,000) nor more than fifty thousand dollars ($50,000). [¶] (c) No person shall be considered to have willfully failed to report, pay, or deliver escheated property, or perform other duties unless he or she has failed to respond within a reasonable time after notification by certified mail by the Controller's office of his or her failure to act."

Plaintiff does not allege that the Controller gave notice to defendants that they failed to report or deliver property subject to escheat under the UPL. In response to the same deficiency in *State of California ex rel. Bowen v. Bank of America Corp.* (2005) 126 Cal.App.4th 225 [23 Cal.Rptr.3d 746], the Second District Court of Appeal aborted the plaintiff's attempt to use the FCA to enforce the UPL. The court concluded: "In this case, plaintiff not only lacked standing to pursue a breach of contract claim or a class action to recover the disputed reconveyance fees, he sought to use the UPL as the hook for imposing reverse false claims liability for violations that are not even punishable under the UPL unless the violator is given notice and an opportunity to correct the alleged violations." (*Id.* at pp. 245–246.) We need not consider the potential implications of a collision between the notice provisions of the UPL and a reverse false claim action under the FCA because, in this case, the jurisdictional bar contained in the FCA precludes plaintiff's qui tam complaint.

*The False Claim Act*

██ Both state and federal false claims legislation "ferrets out fraud on the government by offering an incentive to persons with evidence of such fraud to come forward and disclose that evidence to the government."[3] (*U.S. v. Daniel F. Young, Inc.* (E.D.Va. 1995) 909 F.Supp. 1010, 1015 (*Detrick*); see *American Contract Services v. Allied Mold & Die, Inc.* (2001) 94 Cal.App.4th 854, 858 [114 Cal.Rptr.2d 773] (*American Contract Services*).) The typical whistleblower "is unsophisticated in the legal intricacies of fraud law, and . . . happens across evidence of fraud during the course of employment." (*Detrick, supra,* 909 F.Supp. at p. 1017.) But qui tam actions also "present the danger of parasitic exploitation of the public coffers" by "opportunistic plaintiffs who have no significant information to contribute of their own." (*U.S. ex rel. Springfield Terminal Ry. v. Quinn* (D.C.Cir. 1994) 304 U.S. App.D.C. 347 [14 F.3d 645, 649] (*Springfield*).) Providing cash bounties to

---

[3] California's FCA is " 'patterned on a similar federal statutory scheme (31 U.S.C. § 3729 et seq.).' " (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 801 [107 Cal.Rptr.2d 710] (*Pomona*).) Given the "very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the act." (*Id.* at p. 802; *Laraway v. Sutro & Co.* (2002) 96 Cal.App.4th 266, 274–275 [116 Cal.Rptr.2d 823].)

freeloaders does not serve the purpose of the FCA to protect the public fisc. (*American Contract Services, supra,* 94 Cal.App.4th at p. 858.)

Plaintiff, a lawyer well versed in the nuances of qui tam actions, is not the typical whistleblower. (See, e.g., *U.S. ex rel. El-Amin v. George Washington University* (D.D.C. Oct. 12, 2000, Civ. No. 1:95cv0200)(TAF)(AK) 2000 U.S. Dist. Lexis 15624; *U.S. ex rel. Findley v. FPC-Boron Employees' Club* (D.C.Cir. 1997) 323 U.S. App.D.C. 61 [105 F.3d 675] (*Findley*).) But the FCA does not confine standing to employees or specific kinds of insiders. Nevertheless, he must have acquired inside information that allowed him to "sound the alarm" about undetected fraud on the State of California to the tune of millions, if not billions, of dollars of unclaimed property. (*Detrick, supra,* 909 F.Supp. at p. 1021.) We turn to his own vague description of his inside knowledge of fraud.

He alleges: "The Qui Tam Plaintiff in this action is Alan Grayson. Mr. Grayson served as the President of a communications business in 1990 and 1991. That business is a publicly-traded Fortune 500 international communications corporation that operates in a variety of different markets, including prepaid calling cards. It has assets of over $1 billion. Both before 1990 and since 1991, Mr. Grayson has worked from time to time on matters relating to communications, including prepaid calling cards. He is a member of the International Prepaid Communications Association, the trade association for prepaid calling cards. He edited one of the two leading industry surveys of prepaid communications. He has owned almost one million shares of stock in two different publicly traded communications companies. He reads communications industry publications and financial statements. He has obtained and used unexpired prepaid calling cards in California, the unused value of which the Defendants have failed to report and pay to the Controller. Mr. Grayson has personal knowledge concerning the prepaid communications business."

The FCA assesses treble damages, costs, and a civil penalty of up to $10,000 for each false claim against any person who, among other things, "[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision." (Gov. Code, § 12651, subd. (a)(7).) Assuming defendants' failure to report and deliver the remaining balances on prepaid phone cards is punishable as reverse false claims under the FCA, plaintiff seeks damages on behalf of the People of the State of California and a generous cash bounty for himself. He filed his complaint under seal to permit the California Attorney General to intervene as plaintiff. The Attorney General has declined to intervene in this suit.

The FCA, like its federal counterpart (31 U.S.C. § 3729 et seq.), erects a jurisdictional bar to qui tam actions that do not assist the government in ferreting out fraud because the fraudulent allegations or transactions are already in the public domain. Government Code section 12652, subdivision (d)(3)(A) provides, in part, that "[n]o court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a . . . report . . . by the news media, unless . . . the person bringing the action is an original source of the information." Where there has been a public disclosure the governmental authority is "already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose." (*U.S. ex rel. Feingold v. AdminaStar Federal, Inc.* (7th Cir. 2003) 324 F.3d 492, 495.)

The jurisdictional bar is "triggered whenever a plaintiff files a qui tam complaint containing allegations or describing transactions 'substantially similar' to those already in the public domain so that the publicly available information is already sufficient to place the government on notice of the alleged fraud." (*U.S. ex rel. Longstaffe v. Litton Industries, Inc.* (C.D. Cal. 2003) 296 F.Supp.2d 1187, 1192 (*Longstaffe*).) The fraud, however, need not be explicitly alleged to constitute public disclosure. (*U.S. ex rel. Hansen v. Cargill, Inc.* (N.D.Cal. 2000) 107 F.Supp.2d 1172, 1177 (*Hansen*).) "Of course, whether or not the Government was actually pursuing the allegations at issue in this case is irrelevant to the question of whether said allegations were 'publicly disclosed' for purposes of the FCA. All that is required is a finding that the publicly disclosed allegations were sufficient to put the government on notice of the alleged FCA violations." (*Longstaffe, supra,* 296 F.Supp.2d at p. 1195.)

## II

### BURDEN OF PROOF AND STANDARD OF REVIEW

A qui tam plaintiff bears the burden of establishing that the exercise of the court's jurisdiction is proper. (*Longstaffe, supra,* 296 F.Supp.2d at p. 1190.) However, " '[i]n a facial challenge to the legal sufficiency of the jurisdictional allegations, the Court must accept as true all well-pleaded facts in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction. [Citations.]' " (*City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678 [1 Cal.Rptr.3d 312].)

Because a demurrer tests the sufficiency of a complaint by raising questions of law, we are not bound by the trial court's construction of the complaint and we must make our own independent interpretation. (*Pomona, supra,* 89 Cal.App.4th at pp. 800–801.) "We do not review the validity of the

trial court's reasoning but only the propriety of the ruling itself." (*Id.* at p. 801.) We will thus determine the legal sufficiency of the first cause of action brought under the FCA and the second cause of action for unfair competition. As we will explain, both causes of action fail as a matter of law.

## III

## THE TRIAL COURT LACKED JURISDICTION OVER THE FIRST CAUSE OF ACTION UNDER THE FCA

■ The FCA does not deputize private attorneys general to compel government officials to do their jobs. Rather, it enables insiders to expose fraud without risking their jobs and their purses. (*Hansen, supra,* 107 F.Supp.2d at p. 1185; *U.S. ex rel. Alcohol Foundation v. Kalmanovitz* (S.D.N.Y. 2002) 186 F.Supp.2d 458, 464–465 (*Alcohol Foundation*).) At the same time, the public disclosure bar "limits *qui tam* jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware." (*Findley, supra,* 105 F.3d at p. 678.) In assessing whether the complaint surmounts this jurisdictional hurdle, we must determine first whether the allegations or transactions described in the first cause of action are substantially similar to information already in the public domain and, if so, secondly whether the relator is an original source of the information exposing the fraud. (*U.S. ex rel. Found. Aiding the Elderly v. Horizon* (9th Cir. 2001) 265 F.3d 1011 (*Foundation Aiding the Elderly*).)

Because this is an appeal from an order sustaining a demurrer, we, of course, are limited to plaintiff's allegations. Thus, we must search the face of the complaint for allegations that suggest the asserted fraud is based upon information already in the public domain. In other words, does the complaint sabotage itself?

The fora identified in the statute further limit our review. For example, plaintiff alleges that he personally discussed defendants' "misconduct with Mr. John Shaw ('Shaw'), the former president of the Unclaimed Property Holders Liaison Council. Shaw told the Qui Tam Plaintiff that he had discussed on many occasions with his peers at Defendants AT&T, and Sprint, and also Nextel, the retention of prepaid communications breakage." Shaw also has admitted to plaintiff that he "often discussed prepaid calling card breakage with state officials at NAUPA [National Association of Unclaimed Property Administrators] meetings. Specifically, he spoke to officials of around ten different states. Without exception, state officials told Shaw that prepaid calling card breakage is unclaimed property that must be reported and paid or delivered to the States." While plaintiff's alleged conversations might

suggest that the issue was plainly in the public domain, conversations, even in very public venues, do not satisfy the public disclosure requirements of the statute.

Rather, the FCA limits a court's jurisdiction when public disclosures were made in specific venues. Government Code section 12652, subdivision (d)(3)(A) states, in pertinent part: "No court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, or by the news media . . . ." Defendants assert plaintiff's alleged fraud was disclosed in the news media.

Plaintiff alleges that state officials govern NAUPA, the central organization for state administration of unclaimed property. According to plaintiff, the "chief unclaimed property administrators from all 50 states belong to this organization." The complaint further alleges that the "Winter 1995 NAUPA newsletter featured an article entitled 'Virtual Money,' which stated as follows: [¶] ['] In Europe, for a number of years stored value technology has been used for pay telephones . . . . Could stored value cards create a whole new class of unclaimed property? Absolutely. For those of us in unclaimed property, there is no question that an unclaimed money card balance represents an intangible asset which is due and owing.['] "

Plaintiff asserts that holders of unclaimed property formed a parallel organization, the Unclaimed Property Holders Liaison Council (Holders Council) to influence NAUPA. Members of the Holders Council, including defendants, receive and read NAUPA newsletters, including the article featuring prepaid phone cards as unclaimed property.

The allegation that balances on prepaid phone cards constitute unclaimed property was again reported in *Trends in Taxation: Trends in State and Local Taxation*, in the CCH State Tax Review of June 9, 1997, and reprinted in 75 Taxes 467 on September 1, 1997. This article reported a panel discussion of the CCH State Tax Advisory Board and included John J. Cronin, the National Director of State and Local Tax Services for Deloitte & Touche; George J. Barry, the Principal of the State and Local Tax Division of Arthur Andersen LLP; and J. Gary Dean, a Coopers & Lybrand tax partner. The distinguished panel members from the "Big Four" accounting firms, according to plaintiff, confirmed "that prepaid calling card breakage, including unexpired breakage, must be reported and paid or delivered to the States." The relevant portion of the panel discussion appeared in the tax articles as follows:

"CRONIN: The next subject on our agenda is one that I find interesting, prepaid telephone cards. I go into my local gas station and I buy a $20 calling card . . . [.] What happens to the unused portion of the card if there is an unused portion of the card?

"[MODERATOR]: Is it unclaimed property?

"CRONIN: It would be. That is right exactly."

Plaintiff further alleges that Barry then added: "It is like a deposit." And he asserts that another participant stated that "[s]ome states analogize prepaid telephone cards to the gift certificate situation."

Defendants contend that publication in these trade journals falls within the ambit of the "news media" as the term is utilized by the FCA. Defendants also argue that they reported their unclaimed property to the "public official with direct responsibility for the claim in question," that is, they submitted annual reports as holders of unclaimed property, and notably absent from those reports was the disputed breakage. In defendants' view, the question whether breakage is unclaimed property and their determination that it was not, as plainly disclosed on their annual reports to the Controller, leave no doubt that the government was on notice of the so-called fraud because plaintiff's allegations or transactions were already within the public domain. We agree with defendants that *Findley, supra,* 105 F.3d 675, provides a fitting analogy.

The relators in *Findley* were disappointed vendors who lost their bid to service employee vending machines at a federal prison camp. (*Findley, supra,* 105 F.3d at p. 678.) During the bidding process, they learned that employees' clubs earned revenue from the provision of vending services on federal property, which the relators believed funded social events and "junkets" that violated a number of civil and criminal laws. (*Ibid.*) The district court dismissed their qui tam action because "[b]efore the filing of this action, enough information was in the public domain to expose the allegation that government employees are perpetrating a fraud upon the government by maintaining vending machines on Federal property. The government itself presumably could have brought an action against employees' clubs such as the one at FBC-Boron . . . [without] a *qui tam* suit in the present case." (*Id.* at p. 679.)

*Findley* involved public disclosure in government reports rather than in the news media. But Findley argued, as plaintiff argues here, that he did not rely on the various reports and public statements, and therefore his complaint could not have been "based upon" the public sources of information. (*Findley,*

*supra*, 105 F.3d at pp. 681–682.) Rejecting the rationale of *U.S. ex rel. Siller v. Becton Dickinson & Co.* (4th Cir. 1994) 21 F.3d 1339, 1347–1350, certiorari denied (1994) 513 U.S. 928 [130 L.Ed.2d 278, 115 S.Ct. 316], a case also cited by plaintiff, the court in *Findley* employed a broader construction of the jurisdictional bar "to encompass situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud independent of the public disclosures." (*Findley, supra*, 105 F.3d at p. 683.)

The public disclosures raised "the specter of 'foul play' by acknowledging the questionable legality of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services." (*Findley, supra*, 105 F.3d at p. 687.) Similarly, the tax and journal reports, as plaintiff has alleged, disclosed the questionable legality of withholding phone card breakage. But in both cases, the question is not whether the practice was legal, but whether the government was already on notice of the practice prior to the filing of the qui tam action. In both cases, the qui tam complaint substantially repeats what the public already knows, and as a result, the public disclosure rule bars the action.

Findley, also like plaintiff, insisted that his claim survived because the public disclosures did not identify specific statutory violations or allege the particular type of fraud. (*Findley, supra*, 105 F.3d at p. 686.) Similarly, plaintiff argues that while the reports may have disclosed defendants' knowledge of their duty to report and escheat phone card breakage, they did not specifically name the fraud. But "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed. . . . If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed." (*Id.* at p. 688.)

■ According to the complaint, experts on unclaimed property throughout the country were aware that many believed holders of breakage had a duty to escheat. Moreover, plaintiff alleges that defendants failed to report the breakage to the Controller and failed to escheat the property widely known to be held by defendants and others. Plaintiff, a lawyer with an expertise in false claim litigation, may have recognized the legal consequences of the position defendants took, but his complaint merely echoes what the government already knew and chose not to prosecute. Thus, the public disclosure bar applies.

*Hansen, supra*, 107 F.Supp.2d 1172, provides a second helpful template. *Hansen* reiterates two fundamental principles enunciated in *Findley*: that is,

that a qui tam complaint is "based upon" publicly disclosed allegations if it is "substantially similar" to the publicly disclosed allegations, and that the fraud need not be explicitly alleged to constitute a public disclosure. (*Id.* at p. 1177.) In *Hansen*, unlike *Findley*, the public disclosures were made in the news media. Again, the court discounted the fact that the story did not use the word "fraud." (*Id.* at p. 1178.) The court emphasized that the unmistakable inference that the perpetrators knew of their misrepresentation was enough. (*Ibid.*) What was important to the court, and true here as well, is that the news stories discussing the pertinent aspects of an inflated appraisal and overvalued sale disclosed allegations " 'substantially similar' to the allegations made in [Hansen's qui tam] complaint." (*Ibid.*)

Plaintiff insists that neither the allegation nor the critical elements of the fraudulent transactions were in the public domain. (*Springfield, supra,* 14 F.3d at p. 654.) He argues that the disclosures were more akin to those made in *Foundation Aiding the Elderly, supra,* 265 F.3d at pp. 1015–1017, or, in other words, conspicuously lacking sufficient information to put the government on the trail to fraud. We disagree.

It is true that in *Foundation Aiding the Elderly,* many of the defendant convalescent hospitals had been named in other lawsuits, some of which involved fraud. But none of those complaints alleged that the hospitals had defrauded the government by seeking reimbursement for medical care that was not provided and that was the basis of the qui tam action. Although the civil lawsuits generated press coverage and various public hearings, they "completely failed to disclose anything remotely similar to the fraud alleged here." (*Foundation Aiding the Elderly, supra,* 265 F.3d at p. 1016.) The court concluded that none of the reports or complaints would give the government sufficient information to initiate an investigation against the facilities. (*Ibid.*)

Similarly, the relator in *Springfield* claimed that an arbitrator, appointed to resolve a labor dispute between Springfield Terminal Railway Co. and its union, fraudulently billed the government for services not actually rendered. (*Springfield, supra,* 14 F.3d at p. 647.) Prior to the filing of the qui tam complaint, Springfield had initiated civil litigation challenging the arbitration proceedings, and it was during discovery that it obtained the arbitrator's pay vouchers and telephone records. Springfield and its president thereafter brought their qui tam action based on what had appeared to be innocuous discovery materials.

The court, as a preliminary matter, found that the discovery material was publicly disclosed in a "civil proceeding" within the meaning of the federal False Claims Act. It concluded, however, that the qui tam action was not based upon the allegations or transactions that had been publicly disclosed.

The court found "[t]he pay vouchers and telephone records disclosed during discovery—the only public information considered by the district court—were not in and of themselves sufficient to constitute 'allegations or transactions' of fraudulent conduct within the meaning of the FCA jurisdictional bar." (*Springfield, supra*, 14 F.3d at p. 653.) The court concluded that because neither the fraud nor the critical elements of the fraudulent transaction had been in the public domain, the FCA's jurisdictional bar did not apply. (14 F.3d at p. 653)

These cases all comport with the purpose of false claim legislation. In *Findley* and *Hansen*, the courts lacked jurisdiction because the qui tam actions echoed allegations already in the public domain. Because the qui tam complaints were substantially similar to the quantum of information available to the government, they did not further the FCA's purpose to expose undetected fraud. In *Foundation Aiding the Elderly* and *Springfield*, however, the information known to the public was more innocuous. When a totally different species of fraud has been disclosed or when the facts or documents on their face do not expose fraud, the qui tam complaint serves to alert the government to fraud it otherwise might never have discovered.

We concede that plaintiff's allegations raise a closer issue than the cases upon which either he or defendants rely. Nevertheless, we continue to believe that the information in the public domain had clearly alerted the government to defendants' failure to either report or escheat breakage. Even if we assume that defendants' practices were of questionable legality, as in *Findley*, we conclude, as the court did there, that the government was aware of defendants' practices and decided not to pursue an unclaimed property claim. Because the purpose of the FCA is not to compel the government to prosecute an action, a result more appropriately achieved with a petition for a writ of mandamus, but to expose fraud, plaintiff's qui tam action is unnecessary.

Plaintiff further contends that trade journals and periodicals do not fall within the meaning of "news media" for purposes of the FCA. He construes "news media" much too narrowly. "News media" encompasses "publication of information in scholarly or scientific periodicals." (*Alcohol Foundation, supra*, 186 F.Supp.2d at p. 463.) Plaintiff alleges that the NAUPA newsletter and the CCH tax reports are widely distributed to state officials throughout the country and that tax experts, including defendants' accountants, were well acquainted with the controversy surrounding breakage and unclaimed property law. Thus, we find his notion on appeal disingenuous that this audience, despite its size and geographic distribution, does not represent the public and the disclosures were too narrowly focused to be considered a part of the news media. As the court in *Alcohol Foundation* aptly explained: "No principle of

statutory construction or public policy would compel a cramped reading of the term 'news media' or the imposition of a judicially created limit of 'news media' to encompass only the newspaper context." (*Ibid.*)

Because we conclude the government was on notice of the fraud because of the similarity of the allegations or transactions contained in the news media and the allegations set forth in the first cause of action, we need not resolve an interesting issue raised by plaintiff's opening brief. To support his argument that defendants have defrauded the government by failing to escheat breakage, he attaches to his opening brief a copy of questions and answers printed on the Controller's Web site. According to plaintiff's attachment, the Controller finds that "[b]alances on prepaid phone cards are escheatable to the Bureau of Unclaimed Property and are covered under Unclaimed Property Law and Regulations, Code of Civil Procedure, Title 10, Chapter 7, Section 1520.5." Although the Web site itself reveals that the Controller is well aware of the relationship between breakage and unclaimed property law, neither of the parties have considered whether a disclosure on a Web site constitutes disclosure in the news media or otherwise qualifies as public disclosure under the statute. We leave that question for another day.

■ Having determined the allegations or transactions upon which the qui tam complaint is based were in the public domain before the action was filed, we must next determine whether the court has jurisdiction because plaintiff is an original source of the information. (*Wang v. FMC Corp.* (9th Cir. 1992) 975 F.2d 1412, 1417 (*Wang*).) California's FCA defines an "original source" as follows: "For purposes of subparagraph (A), 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subparagraph (A)." (Gov. Code, § 12652, subd. (d)(3)(B).)

To qualify as an original source, plaintiff must demonstrate he has " 'direct and independent knowledge of the information on which the allegations are based,' [citations], 'voluntarily provided the information to the Government before filing' his or her *qui tam* action, [citation], and 'had a hand in the public disclosure of allegations that are a part of [his or her] suit,' [citation]." (*U.S. ex rel. Devlin v. State of Cal.* (9th Cir. 1996) 84 F.3d 358, 360, fn. 3.) The statutory "original source" requirement was enacted to prevent parasitic lawsuits, those that do not sound the alarm, but echo it. (*Detrick, supra,* 909 F.Supp. at p. 1021.) It seeks to reward whistleblowers "brave enough to speak in the face of a 'conspiracy of silence' and not their mimics." (*Wang, supra,* 975 F.2d at p. 1419.) The FCA precludes " '*qui tam* suits based on

information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.' " (*Gold v. Morrison-Knudsen Co.* (2d. Cir. 1995) 68 F.3d 1475, 1477–1478.)

The "direct" and "independent" prerequisites must be read in the conjunctive. (*Hansen, supra,* 107 F.Supp.2d at p. 1182.) "A relator's information is independently obtained when it is acquired prior to the public disclosure of the allegations." (*Ibid.*) Construing plaintiff's complaint in the light most favorable to him, it could be said his knowledge was "independent." But to earn relator status, he must also demonstrate that he had firsthand knowledge of the fraud, and that he obtained this knowledge through his " ' "own labor unmediated by anything else." ' " (*U.S. v. Alcan Elec. and Engineering, Inc.* (9th Cir. 1999) 197 F.3d 1014, 1020.) Plaintiff's allegations fall miserably short of this yardstick.

Plaintiff alleges that over 15 years ago he was the president of an unnamed communications business for one or two years. According to plaintiff, this billion dollar business operated globally and sold prepaid calling cards. He asserts such other credentials as editing industry surveys, owning stock, and purchasing prepaid phone cards. He fails to allege the " 'who, what, when, where, and how' " of his generic involvement in the industry giving him firsthand knowledge that these defendants were defrauding the government. (*Detrick, supra,* 909 F.Supp. at p. 1022.) His conclusory assertion that he "has personal knowledge concerning the prepaid communications business" does not meet the threshold for pleading direct knowledge of the fraud or, in other words, fraud he "saw with his own eyes." (*Wang, supra,* 975 F.2d at p. 1417.)

Rather, plaintiff's allegations are similar to the secondhand disclosures offered by the putative relator in *Hansen.* The court rejected Hansen's attempt to piggyback on others' disclosures. "Part of the difficulty in analyzing the 'direct' requirement in the context of this case is that Hansen appears to argue that he has 'direct' knowledge of the information upon which his allegations are based because he alone has publicly characterized the defendants' use of the public interest value method as fraudulent. His characterization of information of which he does not have direct knowledge, however, merely adds a legal name to that secondhand knowledge." (*Hansen, supra,* 107 F.Supp.2d at p. 1183.)

So, too, plaintiff calls defendants' failure to escheat breakage fraud. But certainly there is no conspiracy of silence in that, according to his own allegations, the issue has been broadcast in various publications. There appears to be some debate as to whether unclaimed balances on prepaid phone cards are unclaimed property. Whether or not breakage constitutes

unclaimed property under the UPL, however, is beside the point. The point is plaintiff's abject failure to allege facts that he directly exposed fraud on the State of California. Neither the fact that plaintiff may have conducted collateral research and investigation nor that his background knowledge enabled him to understand the significance of defendants' failure to report establish the requisite direct knowledge within the meaning of the FCA. (*U.S. ex rel. Kreindler v. United Technologies* (2d Cir. 1993) 985 F.2d 1148, 1159.) He has not alleged that he was a percipient witness to any of the alleged facts upon which his allegations are based. (*Hansen, supra,* 107 F.Supp.2d at p. 1183.)

Plaintiff's allegations fail to meet the original source requirements for a second reason. "To be an 'original source,' a qui tam plaintiff must be a *source* as well as being an *original* source. . . . To be 'original' the plaintiff must have 'direct and independent knowledge of the information on which the allegations are based.' To be a 'source' the plaintiff must have 'voluntarily provided the information to the Government before filing an action . . . .' " (*U.S. v. Bank of Farmington* (7th Cir. 1999) 166 F.3d 853, 865 (*Farmington*).) Like Eunice Mathews in *Farmington*, plaintiff has failed to allege he did anything to voluntarily provide the information on which his allegations are based to the Controller or any other state official before he filed his qui tam lawsuit. (*Id.* at pp. 865–866.)

## IV

## PLAINTIFF LACKS STANDING TO PURSUE HIS SECOND CAUSE OF ACTION FOR UNFAIR COMPETITION

■ Plaintiff, a nonresident of California, brought his unfair competition claim magnanimously "for the interests of himself and the general public." Prior to the passage of Proposition 64 in November 2004, such expansive pleading would have given him standing under the Unfair Competition Law. (Bus. & Prof. Code, § 17200 et seq.) Proposition 64, however, limited standing to public prosecutors and "any . . . person . . . who has suffered injury in fact and has lost money or property as a result of such unfair competition." (Bus. & Prof. Code, § 17204, amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004).) On appeal, plaintiff does not contend he has suffered actual injury, nor does he seek to bring a representative action and certify a cause. (Bus. & Prof. Code, § 17203.) Rather, he maintains that Proposition 64 should not be applied retroactively to cases pending when the voters adopted the measure. The Supreme Court rejected this contention in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207], holding "the new provisions do apply to pending cases."

Nor should plaintiff be allowed to amend his complaint again. To his credit, he has not asked to amend his unfair competition claim. The unfair practice he describes consists of defendants' fraudulent failure to escheat breakage under the UPL. By definition, therefore, his individual injury, if any, is coextensive in scope and kind with the general public. Yet Proposition 64 requires some wrong or harm to an interest or right over and above the interests and rights held in common with the public at large in order for an individual to have standing to sue. As a consequence, he cannot plead sufficient standing to enable him to amend his complaint to state a viable cause of action.

The judgment is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Sims, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied October 2, 2006, and on September 12, 2006, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 29, 2006, S147262. Werdegar, J., did not participate therein.