Filed 1/6/26

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. JERILYN HENGGELER,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>OMAR DAUOD et al.,<br><br>    Defendants and Respondents. | G064064<br><br>(Super. Ct. No. 30-2020-01130079)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, Kimberly A. Knill, Judge. Reversed and remanded with directions. Request for Judicial Notice. Denied.

Decker Law, James Decker, Griffin Schindler and Chris Jones for Plaintiff and Appellant.

_____

    * Only the Statement of Facts, Procedural History, part I of the Discussion, and the Disposition are certified for publication. (Cal. Rules of Court, rules 8.1105(b) & 8.1110.)

Williams Iagmin, Jon R. Williams and Thomas E. Robertson for Defendants and Respondents James Ballidis and the Law Offices of Allen, Flatt, Ballidis & Leslie.

Law Offices of Scott E. Schutzman and Scott E. Schutzman for Defendants and Respondents Omar Dauod and Gina Dauod.

\*          \*          \*

The Legislature enacted Insurance Code section 1871.7 in 1993 as part of the Insurance Frauds Prevention Act (Ins. Code, § 1871 et seq.; IFPA).[1] That statute contains a qui tam provision which allows a private person to bring a lawsuit on behalf of the State of California. (§ 1871.7, subd. (e)(1).) A qui tam suit is an action brought under a statute which allows a private person to sue for an award of damages, part of which the government will receive. (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538 (*Weitzman*).) In a qui tam suit, the private person is referred to as the relator. (*Ibid.*) Section 1871.7 authorizes a relator to bring a qui tam suit against anyone they believe has committed an act of insurance fraud. (§ 1871.7, subd. (e)(1).)

Here, Jerilyn Henggeler filed a qui tam lawsuit pursuant to section 1871.7, alleging Omar Dauod (Omar), Gina Dauod (Gina) (collectively the Dauods),[2] James Ballidis (Ballidis), and the Law Offices of Allen, Flatt, Ballidis & Leslie (Law Firm) (collectively, Respondents) defrauded Geico Indemnity Company out of $22.9 million which was awarded to the Dauods

---

[1] All further statutory references are to the Insurance Code unless otherwise stated.

[2] Given the parties' shared last name, we refer to them individually by their first names. No disrespect is intended.

following a jury trial (the qui tam complaint). Gina is Omar's wife, and Ballidis was the Dauods' attorney who represented them in connection with their dispute with Geico. The Law Firm employed Ballidis.

At issue here is whether the trial court correctly sustained the demurrers of the Dauods and of Ballidis and the Law Firm on the basis that the trial court did not have jurisdiction to hear the case. The trial court's ruling stemmed from its interpretation of section 1871.7, subdivision (h)(2), which strips the court of jurisdiction if the qui tam suit is "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing[,] in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." (§ 1871.7, subd. (h)(2)(A) (public disclosure bar).)

In sustaining the demurrers, the trial court concluded that, because Henggeler filed the qui tam complaint after reading about the verdict in the news and because aspects of the qui tam complaint contained the Dauods' and Ballidis's testimony from the trial, the public disclosure bar applied. According to the trial court, "[t]hese allegations demonstrate [Henggeler's] claims [were] based on information contained in court files, public records, and news media."

As we explain, the trial court erred. The public disclosure bar does not prohibit the relator from using "information" otherwise publicly available, whether in a civil court file, public record, or from news media. The public disclosure bar applies only when the complaint is based on publicly disclosed "allegations" of fraud or specific fraudulent "transactions." "Information," even information related to allegations of fraud or fraudulent transactions, does not trigger the public disclosure bar. Because the

3

testimony Henggeler utilized in her qui tam complaint was not an allegation of fraud nor was it a fraudulent transaction, its use was not prohibited. We, therefore, reverse. We publish this case, in part, because the interpretation of the public disclosure bar, under these circumstances, appears to be one of first impression, which required us to delve into the legislative and judicial history behind the public disclosure bar. (Cal. Rules of Court, rule 8.1105(c)(2) & (7).)

However, Henggeler's first three causes of action arise under the statute pertaining to workers' compensation fraud. There are no allegations to support such a claim, and the trial court properly sustained the demurrers as to those causes of action. Only the fourth cause of action survives.

Therefore, we reverse the judgments in favor of Respondents and remand with directions to the trial court to enter new and different orders sustaining the demurrers as to the first three causes of action in the second amended complaint[3] and overruling the demurrers as to the fourth cause of action.

## FACTS[4]

According to the qui tam complaint, on October 29, 2009, Omar was driving at a very high rate of speed when he collided with another car which was exiting a private community at a very low rate of speed. The car exiting from the private community failed to make a complete stop prior to

---

[3] The second amended complaint is the operative complaint in this action. Any references to Henggeler's complaint or the qui tam complaint are to the second amended complaint.

[4] Because this is an appeal from orders sustaining demurrers, we summarize those well-pled allegations in Henggeler's complaint. (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 611.)

4

entering the intersection. The two drivers' insurance companies disputed fault for the accident. In 2011, that dispute was submitted to an insurance arbitrator who determined the other motorist was at fault and ordered her insurance company (Farmers Insurance) to pay Omar $100,000.

In May 2012, Ballidis submitted to Geico, on the Dauods' behalf, an underinsured motorist claim which requested $400,000—the maximum amount allowable under the Dauods' policy limits with Geico. The Daouds, through Ballidis, demanded arbitration of the claim; in December 2013, an arbitrator ordered Geico to pay the Dauods $400,000.

In December 2014, Ballidis filed a civil complaint against Geico on the Dauods' behalf, alleging Geico breached its underinsured motorist insurance contract, tortiously breached the covenant of good faith and fair dealing, and intentionally inflicted emotional distress. The Dauods alleged Geico's failure to timely pay out the underinsured motorist claim, as well as its bad faith conduct, caused emotional distress, pain and suffering, the loss of two homes the Dauods owned, and the loss of Omar's business as a real estate developer. (Henggeler did not include in the qui tam complaint the specific factual allegations made against Geico in that civil complaint.) Ballidis did not represent Omar in the civil litigation against Geico but did testify on his behalf at the trial. The Law Firm employed Ballidis during the time of the Geico civil litigation. A jury found Geico liable and awarded Omar $22.9 million in compensation.

Henggeler read about the verdict more than a year later. Henggeler is "a social acquaintance and former neighbor of [Omar and Gina]." Their "daughters are approximately three months apart in age and were playmates." In addition, they share "numerous mutual friends, acquaintances, and former neighbors."

The verdict "appalled" Henggeler because she had witnessed firsthand that Omar was not hurt, was not severely injured, and had not suffered emotional distress on account of the accident. She also knew from conversations with the Dauods that Omar was not a real estate developer, had never been a real estate developer, and did not lose business income due to injuries sustained in the automobile accident. She knew from conversations with Omar's tenants that Omar also did not lose the two homes due to injuries from the automobile accident. Instead, according to those tenants, Omar lost the homes because he pocketed the rental payments instead of applying them to the mortgages.

Omar stated in his underinsured motorist claim to Geico, in the arbitration with Geico, and in his trial testimony in the Geico trial that he was a real estate developer who purchased dilapidated properties and redeveloped them for commercial purposes. However, the Dauods told Henggeler on multiple occasions that Omar was instead a commercial real estate salesman, not a developer. Several of the Dauods' former neighbors, as well as former tenants, confirmed this information to Henggeler.

Throughout the legal proceedings with Geico, Omar and Ballidis represented that Omar had a business partner and the two had various limited liability companies registered in Colorado. The purported business partner, Mark Sharr, was Omar's brother-in-law. Based on her conversations with the Dauods, Henggeler knew Omar was not Sharr's business partner in any of the Colorado ventures. In addition to this firsthand knowledge, Henggeler "researched Colorado public records, including bankruptcy records and civil lawsuits." Henggeler determined that filings with the Colorado Secretary of State showed Omar was not listed as a member of any of the Colorado businesses or that the businesses simply did not exist.

6

Omar testified at the Geico trial that his primary business in 2009, at the time of the accident, was "'development investing in real estate of commercial properties.'" Omar filed Articles of Incorporation in California forming Cielo Financial, Inc. for the stated purpose of real estate investment. However, on December 31, 2009, long before the underinsured motorist claim was filed with Geico, Omar filed a certificate of dissolution of Cielo Financial which noted that it never acquired assets. Based on her conversations with the Dauods, Henggeler knew Omar was not a California or Colorado real estate developer and that Omar's claim and testimony that he lost real estate development income because of the accident was false.

Omar also testified in the Geico trial that he worked as a real estate broker. Henggeler researched Omar's "real estate broker license information" and determined Omar did not possess a real estate broker's license. Further, based on her conversations with the Dauods, Henggeler knew Omar was not a real estate broker.

As part of the uninsured motorist claim submitted to Geico by Ballidis, Omar asserted he had a commercial development project which resulted in financial loss to him because of the motor vehicle accident. He identified the project as "Cielo Inverness," located at 86 Inverness Circle East in Englewood, Colorado; however, Henggeler determined there is no such address. And "[b]ased on multiple conversations with [the Dauods] regarding [Omar's] past employment and professional career, Henggeler knew that [Omar] was not a Colorado real estate developer."

Ballidis testified during the Geico trial that Omar's businesses were still conducting business at the time of Omar's accident in 2009. Based on Henggeler's conversations with the Dauods, she knew Omar was not conducting business at that time. And through "research[ing] public

7

information," she determined that the businesses Omar claimed to be part of had dissolved, had lawsuits filed against them, or had their income assigned to lenders.

Omar stated in his claim to Geico and testified at the Geico trial that he and his business partner purchased six acres of property in Colorado to develop into a golf course and office complex. Based on her conversations with the Dauods, Henggeler knew Omar was not a Colorado real estate developer. She also "researched public records" to determine Omar was not a member of the limited liability company that purchased the property, and the golf course Omar claimed he was going to develop already existed. The insurance claim to Geico stated that the Dauods paid over $600,000 for the property, but, per United States Title records, the deed did not identify either Omar or Gina as an owner of the property. Omar testified he could have satisfied the mortgage on the property if Geico had timely paid out the underinsured motorist claim. Henggeler researched public records and determined the property had been foreclosed on before Ballidis submitted the claim to Geico. Further, Omar stated in the claim, and testified at the Geico trial, that plans for the property were approved by all jurisdictional agencies and that construction was imminent. But Henggeler researched Arapahoe County records and determined no building permits were issued, no inspections were completed, and other formal requirements were not met.[5]

In the underinsured motorist claim, Omar stated that he was working on purchasing a restaurant in Colorado at the time of the accident; he and Ballidis testified to this at trial as well. But, based on her

_____

[5] Arapahoe County is located in Colorado and is the county in which the golf course would allegedly have been built.

8

conversations with the Dauods, Henggeler knew Omar was not a Colorado real estate developer. Omar stated in the claim that escrow was set to close on the restaurant in August 2009. Henggeler determined that Omar and Ballidis submitted a real estate agreement between "Jordan Equities" and "Greenwood Capital Holdings" to support the uninsured motorist claim to Geico. But Jordan Equities never existed in California or Colorado. Additionally, Omar and Ballidis submitted an escrow letter to Geico as part of the claim. But the letter was addressed to Omar's four-year-old son, whom Henggeler knew, and to "Jordan Equities, Inc.," a nonexistent corporation.

The purchase of the restaurant was the subject of yet another civil lawsuit between Sharr and Sharr's business partner (not Omar). In that lawsuit, Sharr's business partner alleged that Omar and Sharr defrauded him out of money related to that restaurant. Henggeler alleged Ballidis falsely testified in the Geico trial that Omar purchased the restaurant. But "[p]roperty title records, [Sharr's business partner's] lawsuit, and financial institution information" showed this was not true.

Omar and Ballidis also submitted a forged letter to Geico to support Omar's restaurant-related damages which was allegedly written by Sharr. But, "[d]ue to the fact that Mark Sharr's signature is on numerous legitimate Colorado public records pertaining to his businesses, development projects, and bankruptcies, Henggeler immediately recognized that Sharr's signature was forged and informed authorities accordingly."

Omar testified at the Geico trial "that in 2005 or 2006 he purchased two acres of land as part of 'Cielo Yosemite' for $400,000 and still owned the land on the date of the accident." However, Omar was not a member of Cielo Yosemite, LLC, and Henggeler "researched public records to provide authorities with evidence that [Omar] falsely testified that he

9

purchased Cielo Yosemite for $400,000 and still owned this land on the date of the accident."

Omar testified at the Geico trial he purchased Cielo Lone Tree in 2005 or 2006 and sold it in 2007 or 2008, "'nett[ing] a million.'" Henggeler "researched public records" to determine Omar was neither a member nor a direct or contract employee of Cielo Lone Tree, LLC, and he had no ownership of the subject property.

Aside from business ventures, Omar testified he lost an income-producing rental property in Newport Coast because Geico did not pay out his underinsured motorist claim. Henggeler spoke with the tenants of that property who told her the Dauods pocketed the monthly rental payments instead of applying them to the mortgage; the tenants claimed the Dauods purposefully allowed the home to go into foreclosure.

Omar also testified that, due to Geico not timely paying the uninsured motorist claim, he lost $600,000 in equity in another home he owned in Irvine. However, Henggeler determined Omar had no equity in that home because it went into foreclosure the day before Omar's automobile accident. The tenants of the Newport Coast home told Henggeler Omar was also pocketing the monthly rental payments for the Irvine home, not making any mortgage payments, and allowing the home to go into foreclosure.

Omar testified at the Geico trial that in 2012, an illness his son was experiencing exacerbated the stress Geico caused him by delaying payments. But Henggeler saw firsthand that the entire Dauod family was active, social, healthy, and happy until they moved away from her neighborhood in 2019 or 2020. She witnessed that the Dauods' son was not ill during the time Geico was not paying the claim.

10

As part of the underinsured motorist claim, Gina sought loss of consortium benefits and stated in support of the claim that the injuries Omar sustained in his accident required heavy pain medication which altered his personality and temperament. However, Henggeler and her neighbors witnessed Omar out in the neighborhood, and he was a "good-natured, personable, charming person with a sunny disposition."

Omar testified at the Geico trial that "he was physically unable to perform his professional responsibilities" because of the accident. But on multiple occasions between October 2009 and December 2010, Henggeler observed Omar playing with his children in front of their home or in their yard. She frequently saw Omar playing basketball outdoors, playing with his children outdoors, swimming, and at the local shopping center with no physical disability. Despite this, Ballidis testified at trial that, on account of the accident, "'Omar will never play basketball again.'" (Nothing in the appellate record explains why Omar's attorney provided testimony regarding his medical condition at the Geico trial.)

PROCEDURAL HISTORY

The qui tam complaint alleged four causes of action: (1) violation of section 1871.4, subdivision (a)(1), against Omar; (2) violation of section 1871.4, subdivision (a)(2), against Ballidis, Gina, and the Law Firm; (3) violation of section 1871.4, subdivision (a)(3), against Ballidis, Gina, and the Law Firm; and (4) violation of section 1871.7, subdivision (b), against all Respondents.

Ballidis and the Law Firm jointly filed a demurrer and the Daouds filed their own demurrer; both demurrers alleged the public disclosure bar applied. Henggeler opposed the demurrers, arguing the allegations in her complaint were not "previously disclosed via any public

11

channel nor [were] they remotely similar to any publicly available information." The trial court sustained the demurrers, finding the public disclosure bar applied because Henggeler read about the jury verdict in the media, she obtained information from others such as Omar's tenants, and the qui tam complaint contained allegations of false testimony and false insurance claims. "These allegations demonstrate [Henggeler's] claims are based on information contained in court files, public records, and news media as well as her own interpretation and speculation." The court entered separate judgments—one in favor of the Dauods and one in favor of Ballidis and the Law Firm—and Henggeler timely appealed from both.

DISCUSSION

On appeal, Henggeler argues the trial court erred because "[n]one of the public disclosures [alleged in her complaint] make a direct claim that one of the Respondents committed fraud, nor do the public disclosures divulge a combination of facts sufficient to permit a reasonable inference of fraud." In addition to arguing the trial court correctly applied the public disclosure bar, Respondents contend we should affirm because the first three causes of action pertain only to workers' compensation fraud; Ballidis and the Law Firm also argue Henggeler failed to comply with prefiling requirements for alleging civil conspiracy involving an attorney and client; and the qui tam complaint is barred by the doctrine of collateral estoppel.

Because the qui tam complaint was not based on publicly disclosed allegations of fraud, it survives demurrer on this ground. We agree with Respondents, however, that the first three causes of action do not state a claim for relief. Finally, we conclude Henggeler did not need to comply with prefiling requirements, and the doctrine of collateral estoppel does not apply here.

12

# I.

## THE TRIAL COURT ERRED IN SUSTAINING THE DEMURRERS

### AS TO THE FOURTH CAUSE OF ACTION

"'On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint alleges facts sufficient to state a cause of action under any possible legal theory. [Citations.] '"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" [Citations.]' [Citation.]" (*Dameron Hospital Assn. v. Progressive Casualty Ins. Co.* (2025) 111 Cal.App.5th 530, 541.)

In the fourth cause of action, Henggeler alleged Respondents violated section 1871.7, subdivision (b). That section provides, in pertinent part: "Every person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject" to certain civil penalties and other equitable remedies. (§ 1871.7, subd. (b).)[6] On appeal, Respondents do

---

[6] Henggeler alleged Respondents violated Penal Code sections 550, subdivisions (a)(1) and (5), and (b)(1) and(2), and Omar and Ballidis violated Penal Code section 550, subdivision (b)(3).

Relevant to the allegations, Penal Code section 550, subdivision (a)(1), makes it unlawful to "[k]nowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance"; and subdivision (a)(5) makes it unlawful to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim." (*Id.*, § 550,

13

not contend the qui tam complaint alleges insufficient facts to state a cause of action under the statute. Instead, the parties' dispute focuses on the applicability of the public disclosure bar, which states, in full, "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing[,] in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." (§ 1871.7, subd. (h)(2)(A).)

Ballidis and the Law Firm argue "the key question is whether 'the publicly available information [was] already sufficient to place the

---

subd. (a)(1)& (5).)

Penal Code section 550, subdivision (b)(1), makes it unlawful to "knowingly assist or conspire with any person" to present "any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact." (*Id.*, § 550, subd. (b)(1).)

Penal Code section 550, subdivision (b)(2), makes it unlawful to assist or conspire to "make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact." (*Id.*, § 550, subd. (b)(2).)

Last, Penal Code section 550, subdivision (b)(3), makes it unlawful to assist or conspire with anyone to "[c]onceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled." (*Id.*, § 550, subd. (b)(3).)

14

[victim] on notice of the alleged fraud" and point us to *State of California v. Pacific Bell Telephone Co.* (2006) 142 Cal.App.4th 741 (*Pacific Bell*). They note that because Geico was the alleged victim of the fraud, and it was previously involved in litigation with Respondents over the insurance claims at issue, Geico necessarily was on notice of "the precise claims alleged to be fraudulent." Henggeler counters that the bar does not apply "where public disclosures give no indication of wrongdoing or contain no allegations of fraud."

The IFPA does not define "allegation" or "transaction" or any other words or phrases within the public disclosure bar. (See § 1871 et seq.) Nor has any case of which we are aware or that was cited to us by the parties done so.[7]

We therefore turn to well-settled principles of statutory construction. "'When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent.' [Citations.]" (*Weitzman, supra*, 107 Cal.App.4th at p. 544.)

Here, we cannot readily ascertain the Legislature's intent from the statutory language itself. (See *Weitzman, supra*, at p. 555 [identifying conflicting federal cases interpreting similar provision which "have expressed widely varying views as to public disclosure"].)[8] We, therefore, start by

---

[7] *Pacific Bell,* relied on by Respondents, was not an action brought under the IFPA, but under the California False Claims Act. (*Pacific Bell, supra*, 142 Cal.App.4th at p. 746, fn. 3.)

[8] *Weitzman* interpreted the public disclosure bar's original source exception. (*Weitzman, supra*, 107 Cal.App.4th at p. 566.) Because we conclude the qui tam complaint was not based on public disclosures of allegations or

15

"'examin[ing] the history and background of the statutory provision in an attempt to ascertain the most reasonable interpretation of the [statute].'" (*Delaney v. Baker* (1999) 20 Cal.4th 23, 29.)

## A.     The Public Disclosure Bar's History

The Legislature originally enacted section 1871.7 in 1993 to combat workers' compensation fraud. (*Weitzman, supra*, 107 Cal.App.4th at p. 547.) The Legislature included the qui tam provision and the public disclosure bar in this initial version. (Stats. 1993, ch. 120, § 3.3 (Assem. Bill No. 1300).) However, despite the inclusion of the public disclosure bar, "[c]ommittee reports that discuss Assembly Bill No. 1300 contain no specific analysis of [the public disclosure bar]." (*Weitzman, supra*, at p. 547.)

The Legislature later expanded the IFPA's protections to include all forms of insurance fraud. (Stats. 1994, ch. 1247, § 1 (Assem. Bill No. 1926).) This was "necessary to deter fraudulent auto insurance claims which [had] become a sophisticated and lucrative business in California." (Assem. Com. on Finance, Insurance and Public Investment, Analysis of Assem. Bill No. 1926 (1993–1994 Reg. Sess.) as amended Jan. 10, 1994, p. 2; Assem., 3d reading analysis of Assem. Bill No. 1926 (1993–1994 Reg. Sess.) as amended Jan. 31, 1994, p. 2.) "The provisions relating to private enforcement remained unchanged," and "[c]ommittee reports analyzing [the amendment] contain[ed] no specific discussion of [the public disclosure bar]." (*Weitzman, supra*, 107 Cal.App.4th at p. 548.) Subsequent amendments to section 1871.7, the substance of which are not relevant here, similarly did not discuss or affect the public disclosure bar. (See Stats. 1995, ch. 574, § 2 (Sen. Bill No. 465); Stats. 1999, ch. 885, § 2 (Assem. Bill No. 1050); Stats. 2005,

transactions, we need not address that exception.

16

ch. 380, § 1 (Sen. Bill No. 706); Stats. 2010, ch. 400, § 26 (Assem. Bill No. 2782); Stats. 2024, ch. 444, § 4 (Sen. Bill No. 577).)

The absence of legislative analysis on the issue may have resulted from the fact that the IFPA was not the first statutory scheme to include a public disclosure bar. The Legislature modeled the IFPA's qui tam provisions and its public disclosure bar after those of the California False Claims Act (Gov. Code, § 12650 et seq.; CFCA). (*State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 596, disagreed with on other grounds by *People ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 819.) The Legislature enacted the CFCA in 1987; the CFCA imposes liability on any person who defrauds the public treasury by submitting a false or fraudulent claim for payment from public funds. (*State ex rel. Edelweiss Fund, LLC v. JPMorgan Chase & Co.* (2023) 90 Cal.App.5th 1119, 1127 (*JPMorgan Chase*).) However, the legislative history does not shed light on the issues presented here. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1441 (1987–1988 Reg. Sess.) as amended July 9, 1987, p. 8.) Like the IFPA, the CFCA and its public disclosure bar were modeled after another statutory scheme—the federal False Claims Act (31 U.S.C. § 3729 et seq.; FFCA). (*Pacific Bell, supra*, 142 Cal.App.4th at p. 746, fn. 3.)

"'The original [federal] False Claims Act was enacted in 1863 in order to strike back against the fraud of unscrupulous Civil War defense contractors.' [Citation.]" (*Weitzman, supra*, 107 Cal.App.4th at p. 553.)[9] When enacted, the FFCA contained a qui tam provision but did not include a public

---

[9] The FFCA makes it unlawful to present a false or fraudulent claim for payment to the United States. (*U.S. ex rel. Yannacopoulos v. General Dynamics* (7th Cir. 2011) 652 F.3d 818, 822.)

17

disclosure bar. To the contrary, it "permitted the relator to bring suit based on publicly available information." (*Weitzman, supra*, at p. 553.) This led to individuals simply copying allegations of fraud from public criminal indictments and bringing a separate qui tam action, which largely benefited the relator who was set to recover a portion of the award. (See e.g., *United States ex rel. Marcus v. Hess* (1943) 317 U.S. 537, 546 (*Hess*), superseded by statute as stated in *U.S. ex rel. Hagood v. Sonoma County Water Agency* (9th Cir. 1991) 929 F.2d 1416, 1420 ["even a district attorney, who would presumably gain all knowledge of a fraud from his official position, might sue as the [relator]"].)

In response to *Hess*, the United States Attorney General asked Congress to repeal the FFCA's qui tam provision entirely. (See Sen.Rep. No. 99-345, 2d Sess., p. 11 (1986).) The House of Representatives passed legislation doing so, but the Senate was reluctant to go that far. (See *id.* at p. 11.) The Senate version, which became law, contains the first reference to a public disclosure bar. As enacted, it provided that the courts would have "no jurisdiction to proceed with any such suit . . . whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.'" (Act of Dec. 23, 1943, Pub.L. No. 78-213, ch. 377, 57 Stat. 609 (codified at 31 U.S.C. § 232(C) (1946).)

Then, in 1984, in *U.S. ex rel. State of Wis. v. Dean* (7th Cir. 1984) 729 F.2d 1100, Wisconsin's Department of Justice and Health and Social Services (the department) conducted an investigation into fraud in Medicaid, a federally funded program. The department was required to provide the results of its investigation to the federal government as part of its participation in Medicaid, which it did. (*Id.* at pp. 1103–1104.) After doing so,

18

the department filed a qui tam action. (*Id.* at p. 1102.) The Seventh Circuit, strictly interpreting the 1943 amendment to the FFCA, held the department could not bring a qui tam case because, even though it discovered the fraud independent of the federal government and utilizing its own efforts, the federal government knew of the fraud before the department filed its suit. (*Id.* at pp. 1103–1104.) Thus, the public disclosure bar applied. (*Id.* at p. 1107.)

In response to this decision, the National Association of Attorneys General adopted a resolution concluding that "'to prohibit sovereign states from becoming *qui tam* plaintiffs because the U.S. Government was in possession of information provided to it by the State . . . unnecessarily inhibits the detection and prosecution of fraud on the Government.'" (Sen.Rep. No. 99-345, 2d Sess., p. 13 (1986).) Thereafter, Senate Bill No. 1562, passed in 1986, amended the public disclosure bar. Notably here, the House's version of the proposed amendment would have required a court to dismiss a qui tam action if it was "'based on *specific evidence* or *specific information* which the Government disclosed as a basis for allegations made in a prior administrative, civil, or criminal proceeding'" or was "'based on *specific information* disclosed during the course of a congressional investigation or based on *specific public information* disseminated by any news media.'" (H.R. No. 99-660, p. 3 (1986), italics added.)

But Congress did not enact a version prohibiting the relator from using evidence or information previously disclosed. Instead, Congress passed a version only prohibiting the use of allegations or transactions. (*U.S. ex rel. Springfield Terminal Ry. v. Quinn* (D.C. Cir. 1994) 14 F.3d 645, 652, fns. 6 & 7; Pub.L. No. 99-562, § 3 (Oct. 27, 1986) 100 Stat. 3157.) Its purpose in

19

doing so was to "encourage those with information about frauds on the government to inform the government about the fraud, assist the government in bringing legal action to bear against the defrauders, and, if necessary, prod the government into action." (*U.S. ex rel. Mistick PBT v. Housing Authority* (3d Cir. 1999) 186 F.3d 376, 403 (dis. opn. of Becker, C.J.) (*Mistick PBT*), disagreed with on other grounds by *U.S. v. Catholic Healthcare West* (9th Cir. 2006) 445 F.3d 1147, 1153.)[10]

B.     *Henggeler's Complaint Is Not Based on Publicly Disclosed Allegations or Transactions*

Ballidis and the Law Firm contend Henggeler's complaint fails because of its "overwhelming reliance on public information." They argue Henggeler improperly relied on information she pulled from public sources, such as filings with the Colorado Secretary of State, public records of loan defaults, bankruptcy records, other civil judgments and lawsuits, and "'Colorado public records.'" They specifically argue the public disclosure bar prohibits Henggeler from utilizing bankruptcy records, other civil lawsuits, or

---

[10] Although we look to federal decisions for assistance in interpreting the public disclosure bar, on this specific issue, they are in "hopeless conflict." (*Weitzman, supra*, 107 Cal.App.4th at p. 559.) Therefore, we cannot glean a clear interpretation from these sources. (See e.g., *Silbersher v. Valeant Pharmaceuticals Intl.* (9th Cir. 2024) 89 F.4th 1154, 1163 [the public disclosure bar applies only if "'(1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was public; and (3) the relator's action is substantially the same as the allegation or transaction publicly disclosed'"]; *Mistick PBT, supra*, 186 F.3d at p. 388 ["a qui tam action is 'based upon' a qualifying disclosure if the disclosure sets out either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims"]; *Federal Recovery Services, Inc. v. U.S.* (5th Cir. 1995) 72 F.3d 447, 451 [a "'qui tam action *even partly based upon* publicly disclosed allegations or transactions is nonetheless "based upon" such allegations or transaction[s]'"].)

other judgments to show that Omar was not a partner in various Colorado LLCs, that some of those LLCs had judgments against them, and that certain legal entities were not formed early enough to substantiate Omar's damages.

Respondents' proposed application of the public disclosure bar is too broad. The bar was never intended to prevent the use of "information" which is publicly disclosed in a manner prescribed by the statute or otherwise. Congress declined to adopt a version which would have prevented a qui tam plaintiff from doing so. Instead, a qui tam plaintiff is simply prohibited from utilizing allegations of fraud or fraudulent transactions previously disclosed in a manner prescribed by the statute. (*Wang v. FMC Corp.* (9th Cir. 1992) 975 F.2d 1412, 1418, overruled on other grounds by *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.* (9th Cir. 2015) 792 F.3d 1121, 1132 [the public disclosure bar "bars suits based on publicly disclosed 'allegations or transactions,' not information"].) This intent is reflected in section 1871.7 itself which contains a clause that provides for a limited recovery to a qui tam plaintiff when the court finds the complaint to have been "based primarily on disclosures of specific information . . . relating to allegations or transactions in a criminal, civil, or administrative hearing." (§ 1871.7, subd. (g)(1)(B).) Thus, the California Legislature, like Congress, recognized the right of the relator to use and rely on information disclosed in public forums in a qui tam complaint.

The civil case records, bankruptcy records, or judgments which Henggeler referenced in her complaint were not allegations of fraud against Respondents nor did they constitute Respondents' fraudulent transactions. Instead, at most, they were simply evidence that Henggeler relied on, in part, to show the Respondents committed acts of insurance fraud—a permissible use.

21

We also note that the majority of the evidence relied on in Henggeler's complaint stems from her own observations, conversations with the Daouds or others, or research from publicly available records not otherwise delineated in section 1871.7. The public disclosure bar does not prohibit the use of such sources, even if the sum of the evidence pulled therefrom amounts to an allegation of fraud or a fraudulent transaction. (*Pacific Bell, supra*, 142 Cal.App.4th at p. 750 [public disclosure bar only "limits a court's jurisdiction when public disclosures were made in specific venues"].)

Alternatively, Ballidis and the Law Firm urge us to adopt a test which asks "whether 'the publicly available information is already sufficient to place the [victim] on notice of the alleged fraud.'" They base their proposed test on *Pacific Bell* which they claim held "the key question" is "whether 'the publicly available information [was] already sufficient to place the [victim] on notice of the alleged fraud.'" But that statement is taken out of context. *Pacific Bell*'s focus was not on "publicly available information," but on whether "'the publicly disclosed allegations were sufficient to put the [victim] on notice . . . .'" (*Pacific Bell, supra*, 142 Cal.App.4th at p. 748.) This does not mean the public disclosure bar applies if the victim culled all publicly available information and determined a fraud occurred. *Pacific Bell* made clear that information, "even in very public venues, do[es] not satisfy the public disclosure requirements of the statute." (*Id.* at p. 750.) Moreover, *Pacific Bell's* language pertaining to notice is just a restatement of what we have already described. If publicly disclosed allegations of fraud or fraudulent transactions are sufficient to put the victim on notice of that fraud, the public disclosure bar applies. (*Id.* at p. 748 ["'All that is required is a finding that

22

the publicly disclosed allegations were sufficient to put the [victim] on notice of the alleged [fraud]'"].)

Ballidis and the Law Firm argue that, even if we do not accept their proposed interpretation, Henggeler's complaint "relied primarily on Ballidis' public testimony at the bad faith trial," and, thus, the public disclosure bar should apply to Ballidis and the Law Firm. Henggeler's complaint certainly contained several references to Ballidis's testimony, and Omar's for that matter. For example, she included Omar's testimony that he was a real estate developer, Ballidis's testimony in support of that, and Omar's and Ballidis's testimony claiming Omar was physically unable to participate in recreational activities because of the accident. But their testimony was not an allegation of fraud or a fraudulent transaction. If anything, it was a repudiation of such. Their testimony was given to support Omar's alleged damages—not to allege that Omar or Ballidis, or any of the Respondents, engaged in insurance fraud.

Ultimately, Henggeler's complaint was not based on specific allegations of fraud or fraudulent transactions that were publicly disclosed in a forum delineated by section 1871.7. Henggeler's use of, and reliance on, publicly available information does not implicate the public disclosure bar under the circumstances of this case. Because the public disclosure bar does not apply, the trial court erred in sustaining the Daouds' demurrer and Ballidis and the Law Firm's demurrer on this basis.

## II.

### THE TRIAL COURT CORRECTLY SUSTAINED THE DEMURRERS AS TO THE FIRST THREE CAUSES OF ACTION BECAUSE THEY WERE BASED ON ALLEGED VIOLATIONS OF AN INAPPLICABLE STATUTE

The first three causes of action in Henggeler's complaint are based on violations of section 1871.4. Section 1871.4 makes it unlawful to give a false or fraudulent material statement to obtain "compensation" as defined in section 3207 of the Labor Code. (§ 1871.4, subd. (a)(1), (2).) As relevant to this appeal, section 3207 of the Labor Code defines "compensation" as "compensation under this division and includes every benefit or payment conferred by this division upon an injured employee." (Lab. Code, § 3207.) The "division" within which Labor Code section 3207 is contained is the "Workers' Compensation and Insurance" division. (Lab. Code, div. 4, pt. 1, ch. 1.) Thus, to state a cause of action for a violation of section 1871.4, Henggeler must have alleged facts demonstrating the Respondents fraudulently obtained workers' compensation benefits. (*People v. Hamilton* (2018) 30 Cal.App.5th 673, 683.)

Here, Henggeler's complaint contains no allegations that the Respondents did so. These causes of action, therefore, fail. The trial court correctly sustained the demurrers as to the first, second, and third causes of action in the qui tam complaint.

## III.

### HENGGELER DID NOT NEED TO COMPLY WITH CIVIL CODE SECTION 1714.10

Next, Respondents argue we should affirm the judgments because Henggeler did not comply with Civil Code section 1714.10 before filing the complaint. Civil Code section 1714.10 limits a plaintiff's ability to bring a suit for conspiracy against an attorney and that attorney's client. It

24

provides, in relevant part: "No cause of action against an attorney for a civil conspiracy with his or her client . . . shall be included in a complaint or other pleading unless the court enters an order allowing the pleading . . . ." (Civ. Code, § 1714.10, subd. (a).)

"The purpose of section 1714.10 is to discourage frivolous claims that an attorney conspired with his or her client to harm another. Therefore, rather than requiring the attorney to defeat the claim by showing it is legally meritless, the plaintiff must make a prima facie showing before being allowed to assert the claim." (*Klotz v. Milbank, Tweed, Hadley & McCloy* (2015) 238 Cal.App.4th 1339, 1350 (*Klotz*).)

As a threshold matter, the parties disagree over whether Civil Code section 1714.10, subdivision (a), is implicated at all. Henggeler contends that she did not allege a conspiracy involving Ballidis and the Daouds, but alleged that Ballidis, himself, committed fraud through his own actions in knowingly submitting a false underinsured motorist claim and falsely testifying about the extent of Omar's injuries and losses. Respondents counter that, regardless of the form of the cause of action, the substance of the allegations was that the Dauods and Ballidis, together, "falsely claimed, falsely stated, or [fraudulently] concealed relevant items and information [from Geico]."

Although Henggeler did not label her fourth cause of action as a claim for civil conspiracy, we look not to the label, but to "the allegations that underpin [the] cause of action." (*Cortese v. Sherwood* (2018) 26 Cal.App.5th 445, 454 (*Cortese*).) Here, Henggeler's complaint may have alleged Ballidis personally committed acts amounting to fraud, but it also alleged that Ballidis and the Daouds, together, committed acts of fraud. We "cannot

25

conceive how [Ballidis] could have participated in the [Daouds' alleged fraud] without an implied agreement to do so." (*Id.* at p. 455.)

However, a plaintiff may assert a cause of action against an attorney for a civil conspiracy involving that attorney's client without obtaining court approval if "the attorney has an independent legal duty to the plaintiff." (Civ. Code, § 1714.10, subd. (c).) "[A]n attorney has an independent legal duty to refrain from defrauding nonclients." (*Klotz, supra*, 238 Cal.App.4th at p. 1351.)

Ballidis and the Law Firm claim that, even though there is an independent duty exception, it does not apply here; they point to *Cortese* and *Klotz* for support. They argue that those "decisions identified an alleged conspiracy in the pleadings, discussed how the exceptions did not apply, and struck the relevant causes of action based on the failure to comply with the procedural mandate of [Civil Code] section 1714.10."

*Cortese* and *Klotz* do not support this position. In *Cortese*, the Court of Appeal held the plaintiff did not sufficiently allege an independent legal duty owed by the attorney. (*Cortese, supra*, 26 Cal.App.5th at p. 458.) The plaintiff there alleged the attorney breached an independent legal duty based on the attorney's "participat[ion] in a trustee's breach of fiduciary duty [owed] to a beneficiary." (*Id.* at p. 455.) Although an attorney can be liable for participating in a trustee's breach of fiduciary duty, in California, "the tort is not independent; instead, it is dependent on the trustee's fiduciary duty." (*Ibid.*)

In *Klotz*, the facts alleged in the complaint did not fall within the exception because the plaintiff did "not allege any duty of [the attorney defendants] that [was] beyond the duty inherent in the rendition of services of an attorney to a client." (*Klotz, supra*, 238 Cal.App.4th at p. 1352.)

26

Here, Henggeler did allege an independent legal duty owed by Ballidis and the Law Firm—specifically, the "independent legal duty to refrain from defrauding nonclients." (*Klotz, supra*, 238 Cal.App.4th at p. 1351.) A conspiracy to defraud a nonclient is conduct which goes beyond the provision of legal services and constitutes a violation of an independent duty. (*Id.* at p. 1352; see also *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 209–210 (*Favila*) ["If the plaintiff seeks to plead a conspiracy claim against an attorney based on fraud or virtually any other common law tort theory, the claim falls within section 1714.10, subdivision (c)(1); the procedural requirements of section 1714.10, subdivision (a), do not apply (that is, the plaintiff need not demonstrate a probability of prevailing on the merits)"].)

Alternatively, Ballidis and the Law Firm argue that the independent duty exception does not apply because the duty was owed to Geico, not Henggeler or the State of California, who are the named plaintiffs. Ballidis and the Law Firm do not provide any authority for their position, and we are not aware of any. Nor are we convinced. Henggeler's qui tam complaint could only be brought in the name of the state. (§ 1871.7, subd. (e)(1).) Even if she wanted to, Henggeler could not name Geico as a plaintiff. It would be nonsensical to require Henggeler to obtain prefiling approval for her qui tam complaint, even though it sufficiently alleges Ballidis and the Law Firm breached an independent duty which would otherwise fall within the exception. Nor does their contention comport with the case law discussing the exception which focuses not on the name of the plaintiff, but the independence of the duty. (See *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 394 [pleading hurdle only applies "to attorney/client conspiracy causes of action which are not viable in any event"]; *Favila, supra*, 188 Cal.App.4th at

27

p. 210 ["an attorney has 'an independent legal duty' not to defraud individuals engaged in business transactions with his or her client"]; *Rickley v. Goodfriend* (2013) 212 Cal.App.4th 1136, 1151 ["an attorney has an independent legal duty to refrain from defrauding nonclients"].)

Therefore, Henggeler had no duty to seek court approval prior to filing the qui tam complaint.

IV.

COLLATERAL ESTOPPEL DOES NOT BAR HENGGELER'S COMPLAINT

Finally, Ballidis and the Law Firm contend Henggeler should be collaterally estopped from bringing this complaint, even if the public disclosure bar does not prohibit it. But they did not raise the issue in the trial court; we therefore decline to consider it for the first time here. Even if we were to consider it, we would conclude there is no privity between Henggeler or the state and Geico.

As a general rule, arguments not raised in the trial court cannot be asserted for the first time on appeal. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.) ""[I]t would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." [Citation.]'" (*Ibid.*) Although we have discretion to consider a new theory for the first time if the issue is purely a question of law, that is not the case here. (*Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709.) Collateral estoppel is a particularly fact-sensitive inquiry. (*Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 400–401 [party urging collateral estoppel has the burden of proving issue was actually litigated which "can be difficult" if record of prior proceeding was not admitted].) We are not a fact-finding tribunal and, therefore, Ballidis and the Law Firm cannot raise the issue for

28

the first time here. (*Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, 605.)

Even if we were to consider the argument, it would fail. ""Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." [Citation.] The doctrine applies "only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding."" (*California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1520.)

Of relevance here, Ballidis and the Law Firm contend Henggeler and Geico were in privity because "Henggeler has a sufficient 'community of interest' with Geico to reasonably expect to be bound by the verdict." We disagree.

"'The concept of privity for purposes of . . . collateral estoppel refers "to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and . . . to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel. [Citations.]" [Citations.]'" (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 90–91.)

29

Here, Henggeler's qui tam complaint was brought in the name of the state, not herself. (§ 1871.7, subd. (e)(1).) And the state had no relationship or identification in interest with Geico in the civil litigation. The state was not a victim, directly or otherwise, of the fraud. (*Weitzman, supra*, 107 Cal.App.4th at p. 562.) The state's interest in qui tam lawsuits, such as this one, is in simply not having to devote its time and resources to investigating and prosecuting acts of insurance fraud. (*Ibid.*) Such an interest is not closely aligned with Geico's interest in avoiding having to pay a potentially large verdict.[11]

## DISPOSITION

The judgment in favor of Omar Dauod and Gina Dauod is reversed, and the judgment in favor of James Ballidis and the Law Offices of Allen, Flatt, Ballidis & Leslie is reversed. The March 29, 2024, order sustaining James Ballidis and the Law Offices of Allen, Flatt, Ballidis & Leslie's demurrer is reversed. The March 1, 2024, order sustaining Omar Dauod and Gina Dauod's demurrer is reversed. The March 4, 2024, order dismissing Omar Dauod and Gina Dauod is reversed.

The trial court is directed to enter a new and different order sustaining the demurrers of Omar Dauod and Gina Dauod, and of James

---

[11]  In conjunction with this argument, Ballidis and the Law Firm requested we take judicial notice of (1) a declaration in support of Geico's summary judgment motion from Omar's civil suit against Geico; (2) a memorandum of points and authorities in support of that summary judgment motion; (3) the special verdict form from Omar's and Geico's civil trial; (4) the jury instructions from that civil trial; and (5) the judgment on the special verdict form from that civil trial. Because we conclude the doctrine of collateral estoppel does not apply for the reasons discussed *ante*, we deny the request as unnecessary to the issues raised in this appeal.

Ballidis and the Law Offices of Allen, Flatt, Ballidis & Leslie as to the first, second, and third causes of action in the second amended complaint without leave to amend and overruling those demurrers as to the fourth cause of action.

Each party shall bear its own costs on appeal.


BANCROFT, J.*

WE CONCUR:


DELANEY, ACTING P. J.


GOODING, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.